FILED LODGED
RECEIVED
MAY 29 2026
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY DEPUTY

Tiffany M. Cartwright, District Judge

United States District Court,

Western District of Washington

Case No: 3:25-cv-05357-TMC

Plaintiff: Dana Serine Greene

Defendant: GSK plc. (formerly GlaxoSmithKline)

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

Plaintiff Dana Serine Greene was twelve years old when a licensed psychiatrist prescribed her Paxil, in March 2000. A contemporaneous clinical evaluation by Robert B. Devney, M.D., dated March 16, 2000 and attached hereto as Exhibit A, documents her pre-prescription baseline with precision: she was cognitively intact, did not have ADHD, and had a negative psychiatric history. A follow-up Psychiatric Summary Update by the same physician, dated February 23, 2001 and attached hereto as Exhibit B, documents new conditions emerging on Paxil eleven months later, the same conditions that led to a cascade of misdiagnosis and compounding harm. What followed was a decades-long cascade of misdiagnosis, medication stacking, structural skeletal underdevelopment, cardiac arrhythmia, and progressive neurocognitive impairment; all traceable to that childhood prescription of a drug whose manufacturer had fraudulently suppressed evidence of its dangers in pediatric populations through the manipulation of Study 329.

GSK plc moves to dismiss on three grounds: lack of personal jurisdiction, untimeliness, and failure to state a claim. None withstands scrutiny. More fundamentally, none is suitable for resolution on a Rule 12 motion.

A child cannot discover a concealed pharmaceutical injury before the medical mechanism becomes knowable. That principle resolves this motion.

Plaintiff does not ask this Court to finally resolve tolling on the pleadings. Plaintiff asks only that the Court decline to dismiss where the complaint alleges childhood exposure during minority, a documented investigative timeline leading to later medical discovery, and active fraudulent concealment by Defendant. Those facts, accepted as true at this stage of the proceedings, are sufficient to make Defendant's limitations and repose defenses unsuitable for resolution on a Rule 12 motion.

Three independent legal shields protect Plaintiff's claims. First, Washington's minority tolling statute, RCW 4.16.190, expressly provides that when a cause of action accrues during minority, that period "shall not be a part of the time limited for the commencement of action." Washington does not expect a child to identify, investigate, plead, and litigate a civil claim while still a minor. Second, the discovery rule preserves Plaintiff's claims because the specific causal connection between Paxil and her structural and neurological injuries was not discovered until November 20, 2023; a conclusion reached through a documented two-stage clinical investigative sequence. Third, GSK's active fraudulent concealment of Study 329's true findings tolls any limitations period that ran during the concealment.

Plaintiff respectfully requests that this Court deny Defendant's Motion to Dismiss in its entirety.

## II. STATEMENT OF RELEVANT FACTS

### A. Pre-Prescription Baseline and Post-Prescription Deterioration: The Devney Record

On March 16, 2000, psychiatrist Robert B. Devney, M.D. conducted a psychiatric consultation assessment of Plaintiff, then twelve years old. Dr. Devney's signed evaluation (Exhibit A) documents the pre-prescription baseline: Plaintiff "does not have ADHD"; she "was cognitively intact"; her "past psychiatric history is negative". Dr. Devney prescribed Paxil to a 12-year-old

child. Exhibit A is Plaintiff's before photograph: a licensed physician's signed record confirming the absence of pre-existing cognitive or structural pathology from which all subsequent harm is measured. Eleven months later, Dr. Devney's Psychiatric Summary Update (Exhibit B) records conditions entirely absent from that baseline: hypomania and depression mood swings; inattention, distractibility, forgetfulness, and disorganization- the same symptoms that led to subsequent providers to misdiagnose Plaintiff with ADHD and prescribe stimulant medication, compounding the harm. Dr. Devney documented these conditions without attributing them to Paxil. That causal attribution did not exist in any medical record until November 2023.

**B. New Conditions Emerged and Were Documented**

Following the initiation of Paxil, Plaintiff experienced a sudden academic collapse, newly developed behavioral symptoms, and cognitive impairment. None were present at the Devney pre-prescription evaluation. These conditions were documented by multiple treating professionals. Rather than identifying these as SSRI-induced symptoms, providers diagnosed Plaintiff with ADHD and prescribed stimulant medication, compounding the harm. Plaintiff's jaw and bone development ceased during the critical adolescent growth period. Cardiac arrhythmias emerged in her early twenties.

**C. A Minor's Parent Filed an SSI Claim in 2001**

On March 30, 2001, Plaintiff's mother filed an SSI disability claim on Plaintiff's behalf as a then-thirteen-year-old minor. Plaintiff was the claimant of record. The filing documented Plaintiff's functional impairments during the period of active Paxil administration.

Plaintiff was thirteen years old. She did not file this claim. Her mother filed it on her behalf, as permitted for minors under applicable federal law.

**D. GSK's Fraudulent Suppression of Study 329**

GSK's Study 329 falsely reported Paxil as safe and effective for pediatric use. This fraudulent representation corrupted the clinical pipeline, serving as the direct basis upon which Plaintiff's physician prescribed the drug to a twelve-year-old in year 2000. While corporate penalties and anecdotal warnings emerged earlier, the foundational scientific fraud remained concealed from the medical community until 2015, when independent researchers operating under the RIAT initiative secured access to individual patient logs and published a total reanalysis in the BMJ, mathematically demonstrating that the original story's conclusions were unsupported by its own raw data.

Even after that reanalysis, the specific causal pathway at issue: Paxil's suppression of REM sleep architecture during critical developmental periods, leading to growth hormone deficiency, mandibular underdevelopment, structural airway obstruction, and resulting sleep apnea, remained outside both published labeling and general medical discourse.

**E. The Two-Stage Investigative Timeline Leading to Discovery**

Plaintiff's 2023 discovery occurred through a documented clinical sequence spanning four discrete events. First, on August 23, 2023, board-certified sleep physician Reuben Walia, M.D. conducted Plaintiff's initial sleep-medicine consultation at Overlake Medical Center Sleep Disorders Clinic. Dr. Walia's signed clinical record, attached hereto as Exhibit C, lists Paxil 20mg as an active current medication and expressly orders its discontinuation two weeks prior to neurological sleep testing, placing Paxil in direct clinical relationship to Plaintiff's documented neurological dysfunction for the first time in any treating physician's contemporaneous record. Plaintiff's Epworth Sleepiness Scale score of 17 confirmed severe neurological impact. Plaintiff was unable to complete follow-up testing because safely discontinuing Paxil within the required timeframe

was not achievable, confirming the drug's continuing physiological hold more than two decades after initial prescription.

Second, on November 1, 2023, Plaintiff underwent an airway and CBCT orthodontic evaluation establishing the structural findings underlying her airway obstruction.

Third, on November 11, 2023, Plaintiff underwent an overnight polysomnography sleep study.

Fourth, on November 20, 2023, Plaintiff received polysomnography results completing the causal attribution; linking Paxil to REM sleep dysfunction, mandibular underdevelopment, and the resulting 100% airway occlusion.

This sequence, not Plaintiff's childhood symptoms, is when the relevant causal investigation became medically actionable.

November 20, 2023 is the operative date of discovery.

**F. Filing Date**

Plaintiff filed her initial complaint on April 25, 2025, seventeen months after the November 20, 2023 discovery date, and well within Washington's three-year statute of limitations measured from that date.

**III. ARGUMENT**

**A. Plaintiff's Claims Are Timely Under RCW 4.16.190 — Washington's Minority Tolling Statute**

Washington's minority tolling statute, RCW 4.16.190, provides that when a cause of action accrues during minority, that period "shall not be a part of the time limited for the commencement of action." Plaintiff was twelve years old when she was prescribed Paxil. The harm GSK characterizes as triggering the limitations clock occurred while Plaintiff was a minor.

No limitations period ran against her during that time. The earliest any clock could have begun running is 2005, when Plaintiff turned eighteen.

GSK argues that Washington's twelve-year statute of repose, RCW 7.72.060, bars Plaintiff's claims because Paxil was delivered in 2000 and the repose period expired in 2012. This argument fails for three independent reasons.

First, permitting a repose period to run against a twelve-year-old child before she could walk into a courthouse would nullify the minority tolling protection the Legislature enacted in RCW 4.16.190. The harm accrued during minority. That statute's protective rationale applies with equal force to repose periods as to statutes of limitation. Plaintiff's repose period runs from majority, not from childhood exposure.

Second, GSK's active fraudulent concealment of Study 329's true findings independently tolls any applicable repose period. A defendant who suppresses the causal mechanism of harm cannot invoke a repose clock that ran during that suppression. That concealment continued until at least 2015.

Third, RCW 7.72.060 does not impose an automatic bar. It creates a rebuttable useful-safe-life presumption that expressly preserves liability where a product seller intentionally misrepresents or conceals information about its product and that conduct proximately causes the claimant's harm. RCW 7.72.060(1)(b)(ii). It further preserves claims where exposure occurred within the useful safe life even if harm manifested afterward. RCW 7.72.060(1)(b)(iii). Both exceptions apply here and neither can be resolved on a Rule 12 motion.

When both doctrines are applied together, Plaintiff files within the repose period. The repose clock did not begin until Plaintiff reached majority in 2005. GSK's ongoing concealment then tolled that clock from 2005 through at least 2015, when Study 329's fraud was first publicly

exposed, consuming the entire intervening decade. Only two years of repose time accumulated before the fraud's exposure. Plaintiff's discovery occurred in November 2023 and she filed in April 2025, within twelve years of the earliest date the clock could have run without interruption. Defendant cannot simultaneously argue that the repose period ran against a minor during a decade of active corporate fraud and that the resulting bar is absolute.

**B. The Discovery Rule Independently Preserves Plaintiff's Claims**

Washington's three-year statute of limitations for personal injury claims, RCW 4.16.080, is subject to the discovery rule: a well-established common law doctrine providing that the limitations period begins to run only when a plaintiff knew or reasonably should have known both the injury and its probable cause with sufficient specificity to bring a legal claim. Awareness of suffering is not awareness of causation. The clock does not begin when a patient feels unwell. It begins when the patient possesses sufficient information to connect that suffering to a specific defendant's specific wrongful act. That moment was on November 20, 2023.

The investigative sequence is documented in the medical record across four clinical events. On August 23, 2023, Dr. Walia's sleep-medicine consultation placed Paxil in direct clinical relationship to Plaintiff's neurological dysfunction for the first time in any contemporaneous treating record, ordering its discontinuation as a prerequisite to neurological testing. Plaintiff could not complete follow-up testing because safely discontinuing Paxil within the required two-week window was not achievable, confirming the drug's continuing physiological hold more than twenty-three years after initial prescription.

On November 1, 2023, an airway and CBCT orthodontic evaluation established the structural findings underlying the airway obstruction.

On November 11, 2023, Plaintiff underwent an overnight polysomnography sleep study. On November 20, 2023, Plaintiff received polysomnography results completing the causal attribution linking Paxil to REM sleep dysfunction, mandibular underdevelopment, and the resulting 100% airway occlusion.

This sequence, not Plaintiff's childhood symptoms, is when the relevant causal investigation became medically actionable. Plaintiff filed seventeen months after that date.

**C. Defendant's Reliance on Plaintiff's SSA Records Proves Too Much**

GSK attaches Plaintiff's SSA complaint and argues that the phrase "thirty-five days after the prescribing physician documented new-onset conditions on Paxil" establishes an earlier discovery date. This argument fails on its face.

Defendant's reliance on Plaintiff's SSA records proves too much. Those records may show that impairment existed during childhood; they do not show that a thirteen-year-old claimant discovered, or reasonably should have discovered, a pharmaceutical products-liability claim against GSK plc.

Symptoms are not causation. A childhood disability file is not a products-liability investigation.

The SSA complaint was drafted in 2026 by an adult plaintiff describing the evidentiary content of a twenty-five-year-old medical record. The phrase describes what a physician documented, not what Plaintiff personally understood at the time. Describing what a historical document shows is not an admission of contemporaneous causal knowledge.

More fundamentally, Plaintiff was thirteen years old when her mother filed the SSI claim on her behalf. A thirteen-year-old child does not possess the medical or legal sophistication to understand that an SSRI was suppressing her jaw growth, disrupting her REM sleep architecture, and causing

a cascade of structural and neurological harm that would not be fully diagnosable for more than two decades. The law does not impute such knowledge to children.

What Plaintiff knew in 2001 was that she felt worse after starting a medication her doctor prescribed. That is not discovery. Discovery under the law requires knowledge of the specific causal mechanism with sufficient particularity to support a legal claim. That knowledge did not exist, for Plaintiff, for her treating physicians or in the published medical records, until November 2023.

Furthermore, Plaintiff notes that the SSA records referenced by GSK are the precise subject of active federal litigation before this Court in the related action Dana Serine Greene v. Social Security Administration. Dismissal of the present action before those historical records are produced and reviewed would be premature. Plaintiff has alleged a plausible, documented timeline supported by contemporaneous medical records. Dismissal before discovery, while related SSA records are actively being pursued in a parallel federal records action before this same Court, would foreclose evidence that has not yet been made available.

**D. GSK's Fraudulent Concealment of Study 329 Tolls Any Remaining Limitations Period**

Study 329 is central evidence of the pediatric-risk concealment alleged here. Plaintiff does not allege that the July 2001 Keller publication directly caused the March 2000 prescription, the prescription predated the Keller paper's publication by fifteen months. Rather, Study 329's manipulation began years before publication and its fraudulent representations were already in motion when the prescription was written. SmithKline Beecham's internal October 1998 position paper, distributed by the Central Medical Affairs department, confirms the company had already determined how to manage the dissemination of negative clinical data nine months before Plaintiff was prescribed Paxil. That off-label promotional campaign, operating on Study 329's manipulated

data in the pre-publication period, directed false pediatric safety representations into Washington prescribing channels. The July 2001 Keller publication subsequently formalized those same representations in the medical literature, perpetuating the concealment through the years GSK plc continued to profit from pediatric Paxil prescribing.

Study 329's conclusions were not supported by its own data. Its pre-specified goals were abandoned and secondary parameters mined until minor isolated measures could be portrayed as clinical victory. The 2015 reanalysis proved paroxetine showed no statistically significant efficacy over placebo when evaluated against the original protocol. At the time of prescribing, the label classified suicidality-related adverse events under the neutral term "emotional lability", a deliberate reclassification that made the drug appear non-threatening to prescribe to minors. The prescribing physician relied on those representations. The fraud was not publicly exposed until 2015.

A physician today reviewing the FDA-approved prescribing information for Paxil will see the mandatory Black Box warning regarding pediatric suicidality. That same label states that "three placebo-controlled trials in 752 pediatric patients with MDD have been conducted with PAXIL, and the data were not sufficient to support a claim for use in pediatric patients." Those three trials are not named in the label. The FDA Center for Drug Evaluation and Research Clinical Review for Paroxetine (NDA 20-031/S-037) identifies them as Study 329, Study 377, and Study 701, all three of which failed to demonstrate efficacy. Study 329 enrolled 275 pediatric patients (Keller et al., JAACAP, 2001) and Study 377 enrolled 286 (Berard et al.,J. Child Adolesc. Psychopharmacology, 2006). The enrollment figure for Study 701 is not separately stated in publicly available sources; given that GSK plc's own labeling certifies the three-trial aggregate as 752, and the first two studies account for 561, Study 701 necessarily accounts for the remaining

191- a figure within GSK's exclusive regulatory possession and subject to confirmation through discovery. The Le Noury 2015 reanalysis, submitted by Defendant as Exhibit E, establishes Study 329's corrupted findings. The DOJ's 2012 sentencing record confirms GSK promoted Paxil for pediatric use based on one published trial while failing to disclose "two other studies in which Paxil also failed to demonstrate efficacy in treating depression in patients under 18". A physician reading today's Paxil label is therefore reading aggregate metrics that incorporate Study 329- a study whose conclusions GSK's own 2012 criminal guilty plea to misbranding, accompanying civil resolution, and the 2015 reanalysis confirm were corrupted. The label has never been corrected. This is not historical fraud. It is ongoing misrepresentation embedded in current FDA-approved prescribing information, tying SmithKline Beecham's original conduct directly to GSK plc's present regulatory obligations and current business practices.

The specific causal pathway at issue, Paxil's suppression of REM sleep architecture during critical developmental periods, leading to growth hormone deficiency, mandibular underdevelopment, structural airway obstruction, and resulting sleep apnea, was not disclosed in any Paxil labeling, not described in the 2015 reanalysis of Study 329, and not available in any form permitting a reasonable person to connect these specific injuries to this specific drug before November 2023. General labeling warnings about sleep disturbance or suicidality do not constitute constructive notice of a specific multi-step mechanistic pathway involving permanent structural skeletal suppression. The discovery rule requires notice of the specific cause of the specific harm alleged. GSK plc's general labeling does not provide that notice. GSK plc's labeling, which pools data across failed trials to frame absolute clinical failure as merely "insufficient data aggregate", does not provide that notice. Discovery will afford Plaintiff the opportunity to examine not only the concealed enrollment and safety metrics of Study 701, but the underlying participant data across

all pediatric and adult Paxil trials, whether published or suppressed, to determine whether the current regulatory architecture reflects or actively distorts the underlying clinical science.

A defendant who fraudulently suppresses the mechanism of harm cannot argue the victim should have discovered it through general public awareness. More fundamentally, the warnings GSK now cites as constructive notice were themselves downstream artifacts of a regulatory environment engineered by Study 329's manipulated data. FDA labeling decisions are informed by the clinical data manufacturers submit. Because GSK's submitted data was manipulated, the resulting warnings reflected the fraudulent scientific record, not the true risk profile GSK's suppressed data revealed. A warning built on manipulated science cannot constitute adequate disclosure of the risks that manipulation concealed. To permit that argument would reward the most complete frauds: those whose concealment was so thorough it shaped the very regulatory record the defendant now invokes as a shield.

**E. This Court Has Personal Jurisdiction Over GSK plc**

GSK plc characterizes itself as a passive UK holding company with no direct involvement in U.S. operations. Yet GSK plc's own Corporate Disclosure Statement, filed in this proceeding on May 12, 2026, simultaneously establishes active participation in U.S. capital markets through ordinary shares listed as American Depositary Receipts on the New York Stock Exchange, and organized American financial infrastructure through JPMorgan Chase Bank, N.A. as Depositary holding more than ten percent of outstanding shares on behalf of U.S. ADR owners. A passive holding company does not list its shares on American exchanges or organize American depository infrastructure.

GSK plc is the direct corporate successor, through merger, to SmithKline Beecham, the entity that funded Study 329, suppressed its findings, and whose drug was prescribed to Plaintiff as a

twelve-year-old child. The corporate lineage is established by GSK plc's own public filings. GlaxoSmithKline plc's Annual Report 2000 and its Form 20-F filed with the SEC both confirm that on December 27, 2000, GlaxoSmithKline plc acquired the whole issued share capital of both Glaxo Wellcome plc and SmithKline Beecham plc by scheme of arrangement. SmithKline Beecham was not a remote stranger to GSK plc, it was one of the two predecessor companies absorbed into the corporate structure now appearing before this Court. SmithKline Beecham conducted Study 329 from 1994 to 1998 and in October 1998, distributed an internal position paper from its Central Medical Affairs department discussing managing dissemination of negative clinical data to minimize commercial impact. A Washington physician prescribed Paxil to Plaintiff on March 16, 2000, relying on SmithKline Beecham's pediatric safety representations, nine months before the merger completed. GSK plc absorbed SmithKline Beecham entirely and inherited its liabilities, revenues, and obligations. A successor corporation cannot accept the benefits of a predecessor's business while disclaiming accountability for that predecessor's wrongful conduct.

The DOJ Press Release dated July 2, 2012 confirms that GlaxoSmithKline LLC, the U.S. operating arm through which GSK plc conducted its American pharmaceutical business and held the Paxil trademark on U.S. soil, agreed to plead guilty to criminal charges and pay $3,000,000,000 to resolve fraud allegations including the promotion of paroxetine for unapproved uses in patients under 18 for conduct occurring from April 1998 through August 2003. Plaintiff's prescription falls squarely within that adjudicated period. GSK plc cannot argue there was no wrongful conduct in Paxil's pediatric promotion when its own U.S. subsidiary has already admitted that conduct to the federal government and paid $3 billion for it. The parent-subsidiary relationship between GSK plc and GlaxoSmithKline LLC, combined with the

subsidiary's criminal liability for the precise conduct alleged here, establishes substantial and direct U.S. connections that cannot be disclaimed through corporate structure. More fundamentally, the fraudulent suppression of Study 329 was not the independent act of a subsidiary. GSK plc's argument is not merely that the wrong entity was named: it is that this claim should proceed nowhere. That is not a corporate structure defense. It is a denial of accountability.

Study 329 has not been retracted. The original published article remains part of the scientific literature, now subject to an expression of concern issued by the JAACAP in September 2025, an interim measure pending further review, not retraction. GSK plc has taken no affirmative steps to remediate the false representations its U.S. subsidiary placed into the medical record. Federal law generally requires generic paroxetine labeling to match the Reference Listed Drug labeling under 21 C.F.R. § 314.94. Although GSK transferred NDA 020031 to Apotex Corp., the labeling architecture GSK established, incorporating Study 329's tainted data pool, transferred with it uncorrected and continues to govern all generic paroxetine distributed in the United States. That labeling framework has never been corrected to reflect the findings or to disclose that all three GSK-funded pediatric studies failed to demonstrate efficacy. These facts support Plaintiff's allegation that the consequences of the original Study 329 representations did not end in 2001 or 2015, and the extent to which GSK plc, GlaxoSmithKline LLC, or affiliated entities continued to benefit from or rely upon that scientific and promotional record is a factual question requiring discovery.

In the United States, FDA approval does not prohibit off-label prescribing to minors. Because off-label prescribing remains highly prevalent, the prescribing physician's primary, and often exclusive defense shield, is the data integrity of the reference listed label.

By presenting 752-patient trial pool as merely “insufficient to support an efficacy claim,” rather than explicitly disclosing that all three trials completely failed to outperform placebo while triggering acute psychiatric and structural harms, the current label masks absolute scientific failure as a statistical near-miss. Federal law binds generic manufacturers to replicate this uncorrected language verbatim, meaning every bottle of paroxetine distributed today carries the functional imprint of SmithKline Beecham’s original data manipulation.

Plaintiff's theory is not merely that a pill injured her. It is that multiple organizational actors participated in, relied upon, circulated, and benefited from scientific representations that enabled widespread pediatric prescribing of a drug with known developmental risks, raising questions about internal corporate communications, regulatory submissions, and organizational decisions surrounding Study 329 that cannot be resolved without discovery.

Where a parent corporation directly participates in or directs the wrongful conduct causing a plaintiff's harm, corporate structure does not shield it from jurisdiction.

Paxil was never FDA-approved for pediatric use. The FDA confirmed in its June 19, 2003 Talk Paper on paroxetine that “three well-controlled trials in pediatric patients with MDD failed to show that the drug [Paxil] was more effective than placebo.” Yet between 1998 and 2003, the precise period during which Plaintiff was prescribed Paxil, SmithKline Beecham and its successor GlaxoSmithKline conducted an illegal off-label promotional campaign directed at U.S. physicians to encourage pediatric prescribing of a drug they knew had failed its own clinical trials. That campaign operated through two documented instruments: SmithKline Beecham's internal document "Seroxat/Paxil Adolescent Depression: Position piece on the phase III clinical studies," Central Medical Affairs Team, October 1998, confirming the company knew Study 329 failed and deemed the true results commercially unacceptable; and Keller et al., JAACAP,

Volume 40, Issue 7, July 2001, "Efficacy of Paroxetine in the Treatment of Adolescent Major Depression," Journal of the American Academy of Child and Adolescent Psychiatry, the fraudulently ghostwritten publication GSK distributed through GSK's 2,000 national sales representatives to physicians across the United States, including Washington State. The DOJ's July 2, 2012 Press Release confirms GlaxoSmithKline pleaded guilty specifically for promoting Paxil for unapproved uses in patients under 18 from 1998 to 2003.

Plaintiff's prescription on March 16, 2000, falls squarely within that adjudicated campaign. A Washington State physician prescribed Paxil to Plaintiff at age twelve, not because Paxil was approved for pediatric use, it was not, but because SmithKline Beecham's sales representatives had directed false safety representations into Washington State prescribing channels. Nine months later, on December 27, 2000, SmithKline Beecham merged into GlaxoSmithKline, which inherited all its liabilities and continued profiting from the prescribing the campaign had generated, making over $1 billion from adolescent Paxil prescriptions in the three years following Study 329's publication, as documented in court records from subsequent litigation.

The most direct evidence of Washington State jurisdiction requires no discovery. A Washington State physician prescribed Paxil to Plaintiff in Washington State. A Washington State pharmacy dispensed it. A Washington State child consumed it repeatedly for more than two decades, one of the last documented instances being August 23, 2023, when Reuben Walia, M.D. recorded Paxil 20mg as an active current medication in a Washington State clinical setting. The harm occurred here. The prescribing physician relied on SmithKline Beecham's fraudulent Study 329 representations here. Specific personal jurisdiction requires only that the defendant's conduct be directed at the forum and that the plaintiff's claims arise from that conduct. Both elements are satisfied on the face of the record.

Washington's common law fraudulent concealment doctrine provides that a defendant who actively conceals a cause of action cannot benefit from a limitations or repose period that ran during the period of concealment. That equitable principle applies with particular force here. SmithKline Beecham's illegal promotional campaign did not merely conceal harm after the fact, it directly caused the prescription in the first place. Without that campaign directing false representations of pediatric safety to Washington State physicians, Plaintiff may never have been prescribed Paxil at all. The entire period from the 2000 prescription through at least the 2015 public exposure of Study 329 fraud was dominated by the defendant's adjudicated wrongful conduct. Where a defendant's illegal promotional activity was the but-for cause of a child's exposure to a harmful drug, and where the defendant's active concealment of the resulting harm prevented discovery for more than two decades, equity does not permit enforcement of a repose period at the pleading stage. Plaintiff asks only that this Court recognize these circumstances as precisely the equitable question that makes dismissal on repose grounds premature. GSK plc, as successor to the enterprise that ran the promotional campaign, absorbed its liabilities through merger, and continued profiting from its consequences, stands in no position to invoke time bars against the plaintiff that campaign harmed.

Defendant cannot disclaim Washington jurisdiction while inheriting the Paxil enterprise that placed the drug, its labeling, and its pediatric safety representations into Washington commerce, where a Washington physician prescribed it to a Washington child and the resulting injuries were sustained. Successor liability answers why GSK plc inherits SmithKline Beecham's obligations. Personal jurisdiction answers why this Court may exercise authority over GSK plc. The Paxil labeling framework SmithKline Beecham established and the U.S. distribution network GSK inherited, both of which carried fraudulent scientific records into Washington commerce and

were subsequently transferred to successor commercial entities without correction, answer why that jurisdiction is properly grounded here and now.

Within the GSK plc corporate group, the connection to U.S. soil was concrete and deliberate. Through GlaxoSmithKline LLC, GSK held the Paxil NDA and trademark in the United States and functioned as the Reference Listed Drug (RLD) sponsor whose labeling architecture established the baseline safety disclosures for all generic paroxetine distributed in the United States under 21 C.F.R. § 314.94. GSK marketed brand-name Paxil to U.S. healthcare professionals through that infrastructure for years following Study 329's publication, profiting from the prescribing the fraudulent promotional campaign had generated. In approximately 2014, GSK transferred NDA 020031, Paxil tablets and oral suspension, to Apotex Corp., which is currently listed as the NDA holder and adverse reaction contact on the operative 2021 label. That transfer does not extinguish GSK plc's liability. It compounds it.

Under 21 C.F.R. § 314.70(c)(6)(iii), GSK possessed unilateral regulatory authority to strengthen or correct the Paxil labeling without prior FDA approval at any point before or at the time of transfer. While the independent RIAT reanalysis would later expose these corrupted conclusions to the public in 2015, GSK executives had possessed internal data proving Study 329's failure for years prior to the 2014 divestiture. GSK did not exercise that authority. It transferred an NDA whose labeling it knew incorporated manipulated pediatric clinical data, packaging the fraud into the asset it sold. Every bottle of Paxil distributed under Apotex's NDA today carries labeling whose clinical foundation GSK corrupted, never corrected, and then conveyed to a successor sponsor without disclosure. The fraudulent regulatory architecture did not end with the transfer. It was laundered through it.

Because federal law requires all generic paroxetine ANDAs to maintain labeling consistent with the RLD under 21 C.F.R. § 314.94, the uncorrected labeling GSK created and transferred continues to govern every generic paroxetine prescription filled in the United States, including every prescription filled in Washington State. A physician reading paroxetine prescribing information today, whether brand or generic, is reading a regulatory record originally built on GSK's manipulated data and never corrected by the entity that manipulated it. GSK plc cannot transfer the commercial asset while retaining none of the accountability for the fraudulent scientific record that gave that asset its market value.

At minimum, jurisdictional discovery is warranted before this Court resolves the jurisdictional question as a matter of law. The full scope of the GSK corporate group's U.S. operations, including the activities of GlaxoSmithKline LLC, the terms and timing of the NDA transfer to Apotex Corp., and any representations made to the FDA in connection with that transfer, cannot be known without discovery. Dismissing for lack of jurisdiction before Plaintiff has had an opportunity to examine that organizational structure and the circumstances of the transfer would be premature and would reward deliberate corporate opacity.

**F. Plaintiff's Claims Are Sufficiently Pled**

Plaintiff's complaint identifies: the specific drug (Paxil/paroxetine); the specific defendant (GSK plc.); the specific fraudulent study (Study 329); the specific mechanism of fraud (fabricating positive results and suppressing negative clinical trial data); the specific harm (structural skeletal underdevelopment, cognitive impairment, cardiac arrhythmia, sleep apnea, and related conditions); and the specific causal connection confirmed by treating physicians in November 2023 and documented in contemporaneous clinical records.

Plaintiff's fraud claims satisfy the heightened pleading standard because they identify the specific fraudulent act, the specific misrepresentation, the specific mechanism of concealment, the party who relied on that misrepresentation, and the specific harm to Plaintiff flowing from that reliance. To further satisfy the Rule 9(b) particularity requirement: the who is SmithKline Beecham and its successor corporate enterprise GSK plc.; the what is the efficacy and safety representations made in connection with Study 329 asserting Paxil's safety and effectiveness for pediatric use; the when is the period from 1994 through 2001 and the continuing concealment of negative clinical data thereafter; the how is the suppression and manipulation of negative pediatric trial data to prevent its disclosure to physicians, regulators, and the public; and the reliance is the prescribing physician's dependence on those pediatric safety representations in prescribing Paxil to a twelve-year-old child. These allegations are sufficiently particular to place Defendant on notice of the precise conduct challenged.

Defendant's reliance on generalized Paxil labeling does not defeat Plaintiff's fraud or failure-to-warn theories at the pleading stage. The suicidality and discontinuation warnings cited by Defendant did not disclose the specific alleged misconduct at issue here: the promotion and use of Paxil in pediatric patients through allegedly manipulated efficacy and safety representations associated with Study 329. Nor did those warnings disclose the specific developmental and structural injury pathway alleged by Plaintiff, including REM sleep disruption during critical growth periods, mandibular underdevelopment, airway obstruction, and resulting sleep apnea. General warnings are not a substitute for disclosure of the specific risk, mechanism, and pediatric-use context alleged in this case.

The absence of a developmental harm warning in Paxil's labeling is not evidence of safety, it is evidence of a study design that was structurally incapable of detecting the harm alleged. Study 329

measured short-term efficacy and safety over weeks in adolescent patients. That timeline was incapable of detecting long-term developmental consequences requiring years of exposure during critical growth periods to manifest. The specific harm alleged here, SSRI-induced REM sleep suppression during critical developmental years, disrupting growth hormone secretion, leading to structural skeletal underdevelopment and permanent airway obstruction and subsequent cognitive impairment, was never studied by GSK over any time horizon sufficient to reveal it. A drug is not established as safe for harms it was never tested for. What the sleep medicine community now recognizes, that SSRIs including paroxetine suppress REM sleep architecture and that this suppression during developmental years carries structural consequences, was absent from Study 329's design entirely. GSK's failure to conduct adequate long-term developmental follow-up studies, combined with its active suppression of the negative short-term data it did possess, left physicians without the information necessary to make informed prescribing decisions for pediatric patients. That informational gap has never been corrected in Paxil's labeling. The absence of a warning about a harm that was never studied is not a defense to a failure-to-warn claim. It is the failure-to-warn claim.

Under Washington's product liability framework, RCW 7.72.030(1)(b), a manufacturer is subject to liability when adequate warnings or instructions are not provided. In the prescription drug context, Washington's learned intermediary doctrine establishes that the manufacturer's duty to warn runs to the prescribing physician. That doctrine does not insulate GSK plc from failure-to-warn liability here: the prescribing physician received warnings drawn from a labeling framework whose clinical foundation, Study 329, GSK knew to be corrupted. A duty to warn the learned intermediary is not satisfied by warnings the manufacturer knows to be false. The prescribing physician is Dr. Devney. His March 2000 evaluation demonstrates he was operating under the

clinical assumption that prescribing Paxil to a twelve-year-old was appropriate. That assumption depended on SmithKline Beecham's pediatric safety representations, representations grounded in Study 329's manipulated data and directed through the off-label promotional campaign to U.S. physicians including Washington prescribing channels. Had Dr. Devney received accurate information, that SmithKline Beecham's data showed Paxil failed its pediatric clinical trials, that internal documents acknowledged the true results were commercially unacceptable for regulatory submission, and that the drug had not been approved for any pediatric use, the reasonable physician exercising ordinary care would not have prescribed it off-label to a twelve-year-old child. The February 2001 follow-up documenting the emergence of entirely new conditions is the medical record of what an adequately warned physician would have prevented.

Washington's Product Liability Act preempts common law negligence claims that are co-extensive with product liability theory. Plaintiff does not contest that the negligence count, to the extent it duplicates the WPLA product liability claim, is governed by WPLA. However, RCW 7.72.010 does not preempt Plaintiff's independent fraud and fraudulent concealment claims, which arise from GSK's deliberate manipulation of scientific research and active suppression of clinical trial data, conduct that is independent of and antecedent to the product's design, manufacture, or labeling. Plaintiff's fraud count stands on its own independent legal footing and is not subject to displacement by the WPLA.

Plaintiff seeks $3,000,000,000 in total compensatory damages across two statutory bases. Under the WPLA, Plaintiff seeks compensatory damages, both economic and non-economic, for permanent structural skeletal harm, twenty-five years of progressive neurocognitive impairment, cardiac arrhythmia, chronic sleep pathology, and the permanent alteration of Plaintiff's developmental trajectory during the critical growth years of childhood. Washington imposes no

statutory cap on WPLA non-economic damages. The duration and developmental onset of the injuries alleged here, originating in a twelve-year-old child and continuing without interruption for more than two decades, support a substantial non-economic damages award. Economic damages under the WPLA include lifetime medical and intervention costs and lost earning capacity proximately caused by the cognitive and structural harm. Under the independent fraud count, which is expressly outside WPLA preemption under RCW 7.72.010, Plaintiff seeks compensatory damages for harm flowing from reliance on fraudulent representations, including the economic costs of decades of prescriptions for a drug whose manufacturer knew its own pediatric trials had failed, and the downstream costs of misdiagnosis and medication stacking caused by deliberate concealment of the true mechanism of harm. The total damages sought reflect the full compensatory scope of twenty-five years of permanent developmental harm caused by a fraud the federal government itself valued at $3,000,000,000 when it extracted that amount from this same enterprise for this same conduct. That figure is a yardstick for the harm's magnitude, not a ceiling on what a child harmed by that conduct is owed. The precise allocation between statutory bases is a matter for the trier of fact and cannot be resolved at the pleading stage while the underlying counts remain at issue.

Plaintiff further seeks economic and property losses under the Consumer Protection Act, RCW 19.86.020, for out-of-pocket costs incurred over decades of prescriptions for a fraudulently marketed drug, damages constituting injury to property within the meaning of the CPA and recoverable independent of personal injury claims. SmithKline Beecham's fabrication of Study 329, its misrepresentation of Paxil's safety to physicians and consumers, and its suppression of negative clinical data to maintain pediatric market share constitute exactly the conduct both statutes were enacted to address. The damages claim should not be dismissed.

**IV. CONCLUSION**

A corporation promoted and benefited from pediatric use of a drug whose risks it concealed, and that drug was prescribed to Plaintiff at twelve years old. The corporation suppressed its own research for more than a decade. The child grew up. She sustained developmental injuries that permanently altered the trajectory of her life. She found physicians who could finally name what had happened to her body. She filed suit seventeen months later.

RCW 4.16.190 protects children from having limitations clocks run against them before they can bring their own claims. RCW 7.72.060(1)(b)(ii) expressly preserves liability where a product seller intentionally misrepresented or concealed information about its product and that conduct was a proximate cause of the claimant's harm. The fraudulent concealment doctrine tolls limitations periods when a defendant's fraud prevents discovery. The discovery rule preserves claims where the specific causal connection could not reasonably have been known at the time of injury.

Every doctrine GSK plc invokes to bar these claims exists in tension with a more fundamental principle: a plaintiff who was harmed as a child by a defendant's fraud is entitled to her day in court.

Plaintiff respectfully requests that this Court deny Defendant's Motion to Dismiss in its entirety and allow this case to proceed to discovery. At minimum, Plaintiff requests jurisdictional discovery and, if any allegation is deemed insufficient, leave to amend rather than dismissal with prejudice.

Respectfully submitted,

Dana Serine Greene, Plaintiff Pro Se

5007 Monta Vista Drive East, Edgewood WA 98372

dfserine@gmail.com

206-795-2063

Signature: [signature] Dated: 05-29-2026

**EXHIBIT LIST**

Exhibit A — Devney Psychiatric Consultation Assessment, March 16, 2000

Exhibit B — Devney Psychiatric Summary Update, February 23, 2001

Exhibit C — Walia Sleep Medicine Consultation Record, Overlake Medical Center Sleep Disorders Clinic, August 23, 2023

# Exhibit A

**Robert B. Devney, M.D.**

PROVIDENCE HEALTH CARE CENTER
12800 Bothell-Everett Highway
Everett, Washington 98208

WOODINVILLE MEDICAL CENTER
17000 - 140th Ave NE Suite 204
Woodinville, Washington 98072
425-481-5700 ext 7# Fax 425-483-0660

RUCKER CLINIC
3020 Rucker Avenue Ste. 305
Everett, Washington

<u>Psychiatric Consultation Assessment Summary</u> March 16, 2000

Dana Fryer is a 12 year old girl (birthdate: October 27, 1987) who was referred for a psychiatric evaluation because of problems with anxiety.

At home she is seen as a very affectionate girl. She worries about many things at home such as gamma rays, Y2K (in 1999), the end of the world, her homework, etc. At school she does well. Her teachers say that she is a "joy to have in class", however she is anxious about many things and calls home two to three times per day. She is very concerned about her appearance, her clothes, being too fat, her self-esteem and projects not being done. Socially things are good although she has limited friendships because she is cautious around issues of trust.

This girl clearly has problems with anxiety. She has generalized anxiety. She may have some problems with obsessions and compulsions but not sufficient for a diagnosis of OCD. She does not have other anxiety related problems. She has no history of depression, mania, rage, or psychosis. She does not have ADHD, nor is she oppositional or defiant. She is related and does not have a PDD. She does not have eating problems. She does not use drugs or alcohol. She has not been abused.

Her past psychiatric history is negative. Her family psychiatric history is that both or her parents have BAD II as do at least three of her five siblings. Four of her five siglings and both of her parents have ADHD. Her mother and one of her siblings have anxiety related problems. Her past medical history is that she has chronic headaches, thought to be migraines. She is allergic to cephalosporins. Her ROS is negative except for her headaches. Her weight is 35 kg. Her physician is Mitch Weinberg, M.D. Ph.D.

Her developmental history is that she was a normally developing infant. As a toddler she played quietly and was happy. She was sensitive to yelling and noise. She did have problems with separation. As a pre-school child she was wonderful, curious and

shy. She was in pre-school for one month but didn't want to go because she missed her mother. In kindergarten and first grades she was a good student with good behavior who was shy and had separation problems. In second and third grades things were the same and she continued to have problems with separation. In fourth grade she continued to have problems with separation and her anxiety around her homework increased. In fifth grade she had markedly increased generalized anxiety although her anxiety around separation decreased. Her parents describe their marriage and family life, now as stable. They openly comment on what it has been like with five people in the family with bipolar disorder and six people with ADHD.

On mental status exam she was an clean, neat, casually dressed pre-adolescent female with good eye contact, easily directable toquestioning. She was related and was appropriate in demeanor and manner. Her behavior and speech were appropriate. She had a broad range of affect and appeared anxious. The form and content of her thoughts were appropriate. She was cognitively intact.

DSM IV Diagnosis: Axis I
1. Generalized Anxiety Disorder
2. H/O Separation Anxiety Disorder
3. R/O Obsessive Compulsive Disorder, mild

II No diagnosis
III No diagnosis
IV Psychosocial stressors: multiple family members with BAD and ADHD
V GAF = 58.

Comments and recommendations:

This girl has generalized anxiety. At times her anxiety takes the form of obsessions and occassionally compulsions. She has a very recent history of separation anxiety. This is often seen in children with generalized anxiety, that is to say that the separation anxiety forms into generalized anxiety.

After much discussion we have elected to go with the SSRI medication, Paxil. I have discussed options, indications, side effects and risks in detail.

Sincerely,

Robert Devney, M.D.

# Exhibit B

**Robert B. Devney, M.D.**

PROVIDENCE HEALTH CARE CENTER
12800 Bothell-Everett Highway
Everett, Washington 98208

WOODINVILLE MEDICAL CENTER
17000 - 140th Ave NE Suite 204
Woodinville, Washington 98072
425-481-5700 ext 7# Fax 425-483-0660

RUCKER CLINIC
3020 Rucker Avenue Ste. 305
Everett, Washington

Psychiatric Summary Update February 23, 2001

Dana Fryer is a now 13 year old girl (birthdate: October 27, 1987) who was referred for a psychiatric evaluation because of problems with anxiety in June 1999.

At home she was seen as a very affectionate girl. She worries about many things at home such as gamma rays, Y2K (in 1999), the end of the world, her homework, etc. At school she does well. Her teachers say that she is a "joy to have in class", however she is anxious about many things and calls home two to three times per day. She is very concerned about her appearance, her clothes, being too fat, her self-esteem and projects not being done. Socially things are good although she has limited friendships because she is cautious around issues of trust.

This girl clearly has problems with anxiety. She has generalized anxiety. She may have some problems with obsessions and compulsions but not sufficient for a diagnosis of OCD. These worries have abated some with the use of Paxil. She does not have other anxiety related problems. She has had problems with hypomania and depression mood swings. There have been no problems with rage, or psychosis. She does appear to have problems with inattention, distractions, forgetfulness and disorganization. She is only modestly hyperactive or impulsive. She is not partiluclarly oppositional or defiant. She is related and does not have a PDD. She does not have eating problems. She does not use drugs or alcohol. She has not been abused.

Her past psychiatric history is negative. Her family psychiatric history is that both or her parents have BAD II as do at least three of her five siblings. Four of her five siglings and both of her parents have ADHD. Her mother and one of her siblings have anxiety related problems. Her past medical history is that she has chronic headaches, thought to be migraines. She is allergic to cephalosporins. Her ROS is negative except for her headaches. Her weight is 35 kg. Her physician is Mitch Weinberg, M.D. Ph.D.

# Exhibit C

# Consult - Aug 23, 2023

with Reuben Walia, MD at Overlake Clinics Sleep Medicine

## Notes from Care Team

Progress Notes by Reuben Walia, MD at 8/23/2023 1:00 PM

OVERLAKE | MEDICAL CENTER & CLINICS

OVERLAKE MEDICAL CENTER SLEEP DISORDERS CLINIC

AMERICAN ACADEMY OF SLEEP MEDICINE ACCREDITED MEMBER CENTER

**Patient:** Dana S Greene **Date:** 8/23/2023

[redacted]

**CC: Sleep evaluation**

**HPI:** Dana S Greene is a 35 y.o. female who presents for her initial visit. Patient presents with a history with nonrestorative sleep. Patient reports that she has felt this way for most of her life. Patient also reports a history of low ferritin. Patient is currently on iron supplements. Patient has a history of snoring and recently underwent a home sleep test which did not establish a diagnosis of sleep disordered breathing. Patient reports a history of TMJ and concerns for a deviated septum. Patient is considering palate expansion. Patient has a history of anemia, anxiety, depression, high cholesterol, mitral valve prolapse, hemophilia A carrier. Epworth Sleepiness Scale 17. Reports a history of nightly snoring with episodes of snorting while asleep. Reports a history of night terrors and sleep paralysis. Patient underwent a home sleep study on 7/30/2023 which demonstrated an RDI of 4.3 and a P AHI of 0.3. This was a WatchPAT study. Minimum SPO2 was 95%. Average oxygen was 98%.

**SLEEP SCHEDULE:**
Bedtime: 11 pm -12 am

Wake Time: 8 am
Sleep Latency: few min
Number of Awakenings: multiple times
Sleep Duration: 7 hours
Naps: endorses Nap Duration 1-2 hours
Sleep in on the weekends: denies
Time to fall back asleep after awakenings: quick

**Sleep ROS:**
Snoring? Yes
Witnessed apneas? No
Experienced choking, gasping or snorting? Yes
Morning headaches? Yes
Morning dry mouth or sore throat? No
Night Sweats? Yes
Wake up to urinate? Yes
Bruxism? Yes Mouth guard? No
Sleep walking, talking, eating, night terrors? Yes
Acting out dreams? No
Abrupt loss of muscle tone with an emotional response? No
Episodes of sleep paralysis? Yes
Nod off while driving? No
Twitching or kicking of legs during sleep, restless sleeper? Yes
Urge to move legs prior to bed? No
Nasal congestion? No

**Past Medical History:**

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Hemophilia A carrier<br>*sees hematologist - will be on meds for 2 weeks PP* | |
| • Mental disorder<br>*Generalized anxiety disorder - taking meds* | |
| • Migraine | |
| • MVP (mitral valve prolapse) | |
| • SVT (supraventricular tachycardia) (HCC)<br>*converted with Adenosine in ER* | |

**Patient Active Problem List**
Diagnosis

- Active labor
- Supervision of normal first pregnancy
- Family history of ischemic heart disease
- Mitral valve prolapse
- Acne
- Adult attention deficit hyperactivity disorder
- Anemia
- Dysmenorrhea
- Generalized anxiety disorder
- Isolated primary Raynaud's phenomenon
- Migraine without aura
- Palpitations
- Tachycardia
- Normal labor

**Past Surgical History:**

**Past Surgical History:**

| Procedure | Laterality | Date |
| --- | --- | --- |
| • DILATION AND CURETTAGE OF UTERUS *x 2* | | |
| • WISDOM TOOTH EXTRACTION | | |

**Meds on File:**

**Current Outpatient Medications**

| Medication | Sig | Dispense | Refill |
| --- | --- | --- | --- |
| • caffeine 200 mg Tab | 300 mg | | |
| • dextroamphetamine sulfate (DEXTROSTAT) 5 MG tablet | 26 mg | | |
| • ferrous bis-glycinate chelate (IRON BISGLYCINATE CHELATE) 28 mg iron Cap | "Blood Builder" by MegaFood:. iron bisglycinate (26mg), Vitamin C (15mg), folic acid (400mcg), Vitamin B12 (30mcg), Beetroot (125mg) | | |
| • metoprolol tartrate (LOPRESSOR) 25 MG tablet | Take 75 mg by mouth 4 (four) times daily Total | | |

| | |
|---|---|
| | daily dose: 75mg |
| • multivitamin (THERAGRAN) tablet | Take 1 tablet by mouth daily. |
| • omega-3/dha/epa/fish oil (OMEGA-3 ORAL) | Omega 3 |
| • PARoxetine (PAXIL) 20 MG tablet | Take 20 mg by mouth daily |

No current facility-administered medications for this visit.

**Social History:**
**Social History**

Socioeconomic History

| | |
|---|---|
| • Marital status: | Married |
| Spouse name: | Not on file |
| • Number of children: | 1 |
| • Years of education: | Not on file |
| • Highest education level: | Not on file |

Occupational History
• Not on file

Tobacco Use

| | |
|---|---|
| • Smoking status: | Never |
| • Smokeless tobacco: | Never |

Substance and Sexual Activity

| | |
|---|---|
| • Alcohol use: | Yes |
| *Comment: very rarely* | |
| • Drug use: | No |
| • Sexual activity: | Yes |
| Partners: | Male |

| | |
|---|---|
| Other Topics | Concern |

• Not on file

Social History Narrative
• Not on file

**Social Determinants of Health**

Financial Resource Strain: Not on file
Food Insecurity: Not on file
Transportation Needs: Not on file
Physical Activity: Not on file

Stress: Not on file
Social Connections: Not on file
Intimate Partner Violence: Unknown
• Difficulty of Paying Living Expenses: Not on file
Housing Stability: Not on file

**Allergies:**

**Allergies**

| Allergen | Reactions |
|---|---|
| • Cephalosporins | Hives |

**Family History:**

**Family History**

| Problem | Relation | Age of Onset |
|---|---|---|
| • Mitral valve prolapse | Father | |
| • Heart attack | Maternal Grandfather | |
| • Diabetes | Maternal Grandfather | |

**Past Pertinent Results:**

**Lab Results**

| Component | Value | Date |
|---|---|---|
| FERRITIN | 31.5 | 09/29/2022 |

,

**Lab Results**

| Component | Value | Date |
|---|---|---|
| TSH | 2.700 | 02/10/2021 |

,

| **Chemistry** | | | | | |
|---|---|---|---|---|---|
| Component | Value | Date/Time | Component | Value | Date/Time |
| NA | 138 | 09/29/2022 1001 | ALKPHOS | 54 | 09/29/2022 1001 |
| K | 4.5 | 09/29/2022 1001 | AST | 17 | 09/29/2022 1001 |
| CL | 103 | 09/29/2022 1001 | ALT | 15 | 09/29/2022 1001 |

| | | | | | |
|---|---|---|---|---|---|
| CO2 | 29 | 09/29/2022 1001 | BILITOT | 0.5 | 09/29/2022 1001 |
| BUN | 15.0 | 09/29/2022 1001 | | | |
| CREATININE | 0.81 | 09/29/2022 1001 | | | |

**Lab Results**

| Component | Value | Date |
|---|---|---|
| WBC | 4.8 | 09/29/2022 |
| RBC | 4.24 | 09/29/2022 |
| HGB | 13.6 | 09/29/2022 |
| HCT | 41.3 | 09/29/2022 |
| MCV | 97.4 | 09/29/2022 |
| PLT | 247 | 09/29/2022 |

, No results found for: HGBA1C, No results found for: VITB12

**ROS:** Denies CP, dyspnea, ankle swelling, palpitations, cough, wheezing, temperature intolerance, rash, musculoskeletal pain/ weakness. All other review of systems is indeterminate.

**Recent Vitals:**
BP 110/60 (BP Location: Left arm, Patient Position: Sitting) | Pulse 74 | Temp 37 °C (98.6 °F) (Temporal) | Resp 16 | Ht 5' 6" (1.676 m) | Wt 57.5 kg (126 lb 12.8 oz) | LMP 08/07/2023 | SpO2 100% | Breastfeeding No | BMI 20.47 kg/m²
Body mass index is 20.47 kg/m².

**Wt Readings from Last 3 Encounters:**

| | |
|---|---|
| 08/23/23 | 57.5 kg (126 lb 12.8 oz) |
| 09/30/22 | 57.4 kg (126 lb 9.6 oz) |
| 10/01/21 | 67.8 kg (149 lb 8 oz) |

**P/E:**

**Physical Exam**

Constitutional:
Appearance: Normal appearance.

HENT:
Head: Normocephalic and atraumatic.
Mouth/Throat:

Mouth: Mucous membranes are moist.
Comments: **MMC 3**
Cardiovascular:
Rate and Rhythm: Normal rate and regular rhythm.
Heart sounds: Normal heart sounds.
Pulmonary:
Effort: Pulmonary effort is normal.
Breath sounds: Normal breath sounds.
Neurological:
Mental Status: She is alert.
Psychiatric:
Mood and Affect: Mood normal.
Behavior: Behavior normal.
Judgment: Judgment normal.

**Impression & Recommendation:**

**1. Hypersomnia**
Patient with a history of excessive daytime sleepiness. Epworth Sleepiness Scale is 17. Patient reports nonrestorative sleep. Patient has a history of sleep paralysis. Will evaluate for narcolepsy versus idiopathic hypersomnia with a polysomnography followed by multiple sleep latency test. Patient to discontinue Adderall and Paxil 2 weeks prior to the sleep study.
- Polysomnography; Future
- Multiple sleep latency test mandatory; Future

**2. Snoring**
Patient reports a history of snoring. Recently underwent a home sleep test which did not establish a diagnosis of sleep disordered breathing. Pathophysiology of obstructive sleep apnea discussed. Will evaluate for obstructive sleep apnea with a polysomnography. ESS is 17.
- Polysomnography; Future

For this visit, time spent preparing for the encounter was 10 minutes, including reviewing previous records. Total time spent with history of present illness was 20 minutes. Time spent on physical exam was 5 minutes. Counseling and educating patient took 15 minutes. Documenting clinical information and updating health record took 10 minutes. Total time

spent visiting with the patient and charting was 60 minutes.

**Primary Care Provider:** AMY S NUMRYCH, MD **Phn:** 425-454-5311
**Fax:** 425-454-8188

***Reuben Walia, M.D.***
***Board Certified in Sleep Medicine***

**Overlake Medical Center, Sleep Disorders Center**
**1100 112th Ave NE, Suite 320**
**Bellevue, WA 98004**
**425-289-3000**

MyChart® licensed from Epic Systems Corporation© 1999 - 2026

Tiffany M. Cartwright, District Judge

United States District Court,

Western District of Washington

Case No: 3:25-cv-05357-TMC

Plaintiff: Dana Serine Greene

Defendant: GSK plc. (formerly GlaxoSmithKline)

## CERTIFICATE OF SERVICE

I hereby certify that on 05-29, 2026, I caused the foregoing Plaintiff's Opposition to Defendant's Motion To Dismiss, together with Exhibits A, B, and C attached thereto, to be served upon the following counsel of record for Defendant GSK PLC by depositing a true and correct copy in the United States mail, first-class postage prepaid, addressed as follows:

GORDON TILDEN THOMAS & CORDELL LLP

Attorneys for Defendant GSK plc

Jeffrey M. Thomas

Mark A. Wilner

600 University Street, Suite 2915

Seattle, Washington 98101

206-467-6477

jthomas@gordontilden.com

mwilner@gordontilden.com

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

**Dana Serine Greene**

Plaintiff, Pro Se

5007 Monta Vista Drive East

Edgewood, Washington 98372

Phone: 206-795-2063

Email: dfserine@gmail.com

Signature: [signature]

Date: 05 - 29, 2026