____ FILED ____ LODGED
____ RECEIVED

JUN 26 2026

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY DEPUTY

Tiffany M. Cartwright, District Judge
United States District Court,
Western District of Washington
Case No: 3:25-cv-05357-TMC
Plaintiff: Dana Serine Greene
Defendant: GSK plc. (formerly GlaxoSmithKline)

# PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY

NOTING DATE: July 17, 2026

## I. RELEVANT BACKGROUND

On June 9, 2026, Defendant GSK plc filed its Reply in support of its Motion to Dismiss (Dkt. 28), attaching a sworn Corporate Declaration from Victoria Whyte (Dkt. 29). Paragraph 6 of that Declaration asserts an absolute categorical denial: that GSK plc "has never researched, designed, developed, manufactured, marketed or sold any products or services anywhere in the world, including the United States and the State of Washington."

This sweeping assertion was introduced for the first time at the final stage of briefing, leaving Plaintiff no procedural opportunity to present documented evidence that directly refutes it.

Because the Whyte Declaration creates a material factual dispute that cannot be resolved on the existing record, jurisdictional discovery is warranted before the Court rules on the pending Motion to Dismiss.

## II. LEGAL STANDARD

Where a defendant introduces a sworn declaration raising new factual assertions about its corporate structure at the reply stage, and a plaintiff demonstrates a colorable basis for jurisdiction supported by documentary evidence that conflicts with the declaration, courts in this Circuit hold that jurisdictional discovery is warranted. A motion to dismiss should not be granted without allowing discovery when the disputed jurisdictional facts are uniquely within the defendant's control and the record contains documented contradictions between the defendant's sworn submissions and publicly verifiable sources.

## III. ARGUMENT: THREE DOCUMENTED CONFLICTS REQUIRE DISCOVERY

A stark and verifiable conflict exists between the Whyte Declaration's categorical denial and multiple public records bearing GSK plc's own corporate name. Three distinct contradictions are presented below.

### A. GSK plc's Own Clinical Study Report Documents Direct U.S. Research Activity, Including a Washington State Clinical Center

Paragraph 6 of the Whyte Declaration states that GSK plc has "never researched" products anywhere in the world. This assertion is directly contradicted by the GlaxoSmithKline Final Clinical Study Report for Study 716, a 2,405-page internal corporate document bearing the author designation "GlaxoSmithKline plc" in its PDF metadata, with an issue date of September 16, 2002.

The Study 716 CSR documents a multi-center, open-label, six-month extension study of paroxetine (Paxil) in children and adolescents, conducted at 49 centers in the United States and 2 centers in Canada. Table 1 of the CSR lists Center 168 as located in Seattle, Washington. The study ran from May 1, 2000 through January 29, 2002, a period that spans both the December 2000 formation of GSK plc through merger and the years of conduct at issue in this litigation. (See Exhibit 1, Study 716 CSR Synopsis and Table 1 excerpt.)

A document bearing GSK plc's corporate authorship, documenting U.S. clinical research activity at a Washington State site, cannot be reconciled with Paragraph 6's absolute assertion of no activity anywhere. This conflict requires discovery into which officers at the parent-company level held governance authority over the NDA 020031 pediatric safety database and the clinical trial program during this period.

**B. The Study 716 CSR Documents the Precise Fraudulent Reclassification Mechanism at Issue in This Litigation**

The jurisdictional significance of Study 716 is not limited to its geographic footprint. The CSR contains internal evidence of the adverse-event reclassification that is central to Plaintiff's fraud count. At internal page 000169, the CSR states:

*"The most common serious adverse event was emotional lability, occurring in 2.3% (6/265) of patients entered into the study. Verbatim terms that coded to a preferred term of emotional lability were suicidal ideation (2 patients), attempted suicide (2 patients) and suicidal (1 patient) in the acute-study paroxetine group, and hospitalization for suicide attempt (1 patient) in the acute-study placebo group."*

Section 5.2.1 of the CSR separately documents ten paroxetine-group verbatim terms coded as "emotional lability," which include: "2 suicidal ideation, 2 attempted suicide, and one each wound right hand self-inflicted with pencil, consumed 10 tabs of Aleve, suicidal, heightened emotions, increased weeping, and unstable mood." (CSR at internal page 000131.)

Children in acute suicidal crisis were coded as experiencing "emotional lability" in GSK's regulatory submissions. The question of which corporate officers, at which level of the GSK plc structure, authorized and maintained that coding scheme across Studies 329, 377, 701, and 716 is precisely what jurisdictional discovery will resolve. If that authority resided at the parent-company level, as the corporate authorship of the Study 716 CSR itself suggests, personal jurisdiction over GSK plc follows directly.

**C. Victoria Whyte's Own SEC Filings on Behalf of GSK plc Contradict Her Declaration**

The officer who signed the declaration asserting that GSK plc has never engaged in any commercial or research activity anywhere in the world is the same officer whose name appears on

the SEC Form 6-K filings submitted on behalf of GSK plc in 2012; the year of the $3 billion DOJ settlement directly concerning the fraudulent marketing of Paxil.

Victoria Whyte executed multiple SEC Form 6-K filings throughout 2012 as "Authorised Signatory for and on behalf of GlaxoSmithKline plc," including the July 2, 2012 filing in which GlaxoSmithKline plc announced to the United States Securities and Exchange Commission: "GlaxoSmithKline plc (GSK) today announced that it has reached an agreement with the US Government, multiple states and the District of Columbia to conclude the Company's most significant ongoing Federal government investigations." That announcement expressly identified "the marketing of Paxil for paediatric use" as among the resolved conduct. (See Exhibit 3, GSK Form 6-K, July 2, 2012.)

Additionally, the Corporate Integrity Agreement (CIA) issued as part of the 2012 DOJ settlement, formally between the OIG and GlaxoSmithKline LLC, contains within its operative text direct obligations imposed on the "Chief Executive Officer of GlaxoSmithKline PLC" and the "Board of GlaxoSmithKline PLC." The CIA requires that the Compliance Officer be appointed by the Chief Executive Officer of GlaxoSmithKline PLC and that compliance reports be made periodically to the Board of GlaxoSmithKline PLC. The formal contracting party is the LLC; the compliance authority runs through the PLC's own chief executive and board. This confirms that the federal enforcement instrument recognized the parent entity as bearing operational authority over U.S. pharmaceutical conduct. (See Exhibit 4, DOJ CIA Excerpt, available at justice.gov/opa/documents/gsk/plea-ex-d.pdf.)

A corporate officer cannot simultaneously execute sworn representations to the U.S. Securities and Exchange Commission describing her company's billion-dollar operational settlement with the U.S. Government over Paxil marketing, and then declare under oath in a federal court proceeding that the same company has never marketed or sold products anywhere. This irreconcilable conflict is alone sufficient to warrant jurisdictional discovery.

## IV. REQUEST FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1. Defer ruling on Defendant's pending Motion to Dismiss until targeted jurisdictional discovery is complete;
2. Grant Plaintiff a 60-day window of jurisdictional discovery or the amount of time Judge Cartwright deems appropriate, and limited to the following narrow categories:

**a.** Corporate governance documents identifying which parent-company officers at GSK plc held authority over the Paxil NDA 020031 pediatric safety database during the period 2000–2014, including any transfer of that authority;

**b.** Intercompany management services agreements or operating protocols between GSK plc and GlaxoSmithKline LLC governing oversight of U.S. clinical trial programs, including Study 716;

**c.** Interlocking directorate and officer rosters between GSK plc, Glaxo Wellcome plc, SmithKline Beecham plc, and their U.S. subsidiaries from December 2000 through 2006;

**d.** Documents sufficient to identify which entity or corporate officers authorized the adverse event coding protocol that reclassified suicidal ideation and self-harm events as "emotional lability" across Studies 329, 377, 701, and 716; and

**e.** The Corporate Integrity Agreement compliance documentation submitted by GSK plc's CEO pursuant to the 2012 DOJ settlement, to the extent it identifies parent-company authority over U.S. pharmaceutical operations.

3. Following completion of jurisdictional discovery, grant Plaintiff leave to file a supplemental jurisdictional brief, addressing the additional record developed through discovery.

This motion is supported by the concurrently filed Declaration of Dana Serine Greene, with Exhibits 1 through 4.

DATED this 26 day of June, 2026.

Respectfully submitted,

Signed: ______________________

Dana Serine Greene

Pro Se Plaintiff

Case No. 3:25-cv-05357-TMC

## CERTIFICATE OF COMPLIANCE

Pursuant to LCR 7(e)(3), I certify that this motion contains 1,354 words, in compliance with the word limit of 4,200 words applicable to motions noted under LCR 7(e)(3). This word count was generated by Microsoft Word.

Signed: ____________________

Dana Serine Greene

Plaintiff Pro Se

Case No. 3:25-cv-05357-TMC

Dated: June 26, 2026