FILED LODGED
RECEIVED
JUN 26 2026
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY DEPUTY

**Honorable Tiffany M. Cartwright**
United States District Court,
Western District of Washington
Case No: 3:25-cv-05357-TMC
Plaintiff: Dana Serine Greene
Defendant: GSK plc. (formerly GlaxoSmithKline)

# DECLARATION OF DANA SERINE GREENE IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY

I, Dana Serine Greene, declare as follows:

## I. IDENTITY AND BASIS FOR DECLARATION

**1.** I am the Plaintiff in the above-captioned action, proceeding pro se. I make this declaration based on my personal knowledge and my review of documents that I personally obtained from publicly accessible sources. If called as a witness, I could and would testify competently to the matters set forth herein.

**2.** I submit this declaration in support of my Motion for Leave to Conduct Jurisdictional Discovery, filed concurrently herewith. The purpose of this declaration is to authenticate the four exhibits attached hereto and to provide factual context for the documented conflicts between Paragraph 6 of the Whyte Declaration (Dkt. 29) and the public record.

## II. EXHIBIT 1: GSK STUDY 716 FINAL CLINICAL STUDY REPORT

**3.** Attached hereto as Exhibit 1 are true and correct excerpts from the Final Clinical Study Report for Study 716, titled "A Multicenter, Open-label, Six-Month Extension Study to Assess the Long-term Safety of Paroxetine in Children and Adolescents with Major Depressive Disorder (MDD) or Obsessive-Compulsive Disorder (OCD)."

**4.** I personally accessed and downloaded this document by navigating my web browser directly to the following URL, hosted on GSK's French corporate domain:

**`https://fr.gsk.com/media/40tewrh1/depression_716_final_full.pdf`**

**5.** I first accessed this document on May 25, 2026 at approximately 1:51-1:53 PM. That screenshot is included as part of Exhibit 1 and depicts the document cover page as rendered in my browser, with the fr.gsk.com domain visible in the browser address bar.

**6.** At the time I accessed the document, it was publicly available at that URL without any authentication, login, paywall, or access restriction.

**7.** The document's cover page, as visible in my screenshot and confirmed by the downloaded PDF, displays the following identifying information on page 000001:

Header: BRL-029060/RSD-101RLL/1/CPMS-716 | Page 000001

Corporate designation: The GlaxoSmithKline group of companies | Confidential

Drug: Paroxetine | BRL-029060

Study designation: Study 716

Study Initiation Date: 01 May 2000

Study Completion Date: 29 January 2002

Document type: Final Clinical Study Report

SB Document Number: BRL-029060/RSD-101RLL/1

Issue Date: 16 September 2002

Copyright notice: Copyright 2002 the GlaxoSmithKline group of companies. All rights reserved. Unauthorized copying or use of this information is prohibited.

**8.** I verified the PDF metadata of the downloaded file using the Mac Finder Get Info panel. The Author field displays: GlaxoSmithKline plc. This designation is embedded in the document's own properties and was not added or modified by me. A screenshot of the Mac Finder Get Info panel confirming this metadata is included as part of Exhibit 1.

**9.** The Study 716 CSR documents a clinical trial conducted at 49 centers in the United States and 2 centers in Canada. Table 1 of the CSR, titled "Investigators, the Assigned Center Number and the Investigator Hospital or University Affiliation and Location," lists Center 168 with a City/State

designation of Seattle, WA on page 000034. The relevant pages of Table 1 are included in Exhibit 1.

**10.** At internal page 000169 of the CSR, under the heading for Serious Adverse Events, the document states:

> *"The most common serious adverse event was emotional lability, occurring in 2.3% (6/265) of patients entered into the study. Verbatim terms that coded to a preferred term of emotional lability were suicidal ideation (2 patients), attempted suicide (2 patients) and suicidal (1 patient) in the acute-study paroxetine group, and hospitalization for suicide attempt (1 patient) in the acute-study placebo group."*

**11.** In Section 5.2.1, Open-label Treatment Phase Emergent Adverse Events, at internal page 000131, the CSR further states:

> *"In the paroxetine group, the verbatim terms for the 10 occurrences of emotional lability were 2 suicidal ideation, 2 attempted suicide, and one each wound right hand self-inflicted with pencil, consumed 10 tabs of Aleve, suicidal, heightened emotions, increased weeping, and unstable mood."*

**12.** These passages document that GSK's internal adverse event coding classified children experiencing suicidal ideation, attempted suicide, and active self-harm as experiencing "emotional

lability" in its regulatory reporting. This is the same reclassification mechanism underlying Plaintiff's fraud count in this litigation.

## III. EXHIBIT 2: GSK STUDY REGISTER SCREENSHOT

**13.** Attached hereto as Exhibit 2 is a true and correct screenshot I captured of the GSK Study Register listing for Study 716 at gsk-studyregister.com, showing GSK Study ID 29060/716, the full study title, and the trial status designation "Study complete." I captured this screenshot on May 26, 2026, prior to filing my opposition.

**14.** The gsk-studyregister.com domain is GSK's own publicly maintained clinical trial transparency platform. The Study 716 listing identifies the same Protocol ID — 29060/716 — as appears on the face of the Study 716 Final Clinical Study Report described in Section II above, and confirms that GSK itself has treated this report as a publicly available transparency document.

**15.** The study register listing identifies the ClinicalTrials.gov ID and EudraCT ID for Study 716 each as "Not applicable," consistent with the study having been initiated prior to mandatory trial registration requirements. The absence of a ClinicalTrials.gov registration does not diminish the evidentiary weight of the CSR, which is GSK's own internal corporate record of the trial.

## IV. EXHIBIT 3: GSK plc SEC FORM 6-K, JULY 2, 2012

**16.** Attached hereto as Exhibit 3 is a true and correct copy of the SEC Form 6-K filed by GlaxoSmithKline plc with the United States Securities and Exchange Commission on July 2, 2012, retrieved from the SEC's EDGAR public database at:

`https://www.sec.gov/Archives/edgar/data/0001131399/000119163812000884/gsk201207026k4.htm`

**17.** SEC EDGAR filings are official public records of the United States government. The July 2, 2012 Form 6-K was filed by GlaxoSmithKline plc as the registrant. The filing announces:

> *"GlaxoSmithKline plc (GSK) today announced that it has reached an agreement with the US Government, multiple states and the District of Columbia to conclude the Company's most significant ongoing Federal government investigations."*

**18.** The same filing states that "GSK will plead guilty to misdemeanor violations of the Federal Food, Drug, and Cosmetic Act related to certain aspects of the marketing of Paxil for paediatric use."

**19.** The signature block of the July 2, 2012 Form 6-K reads: "GlaxoSmithKline plc (Registrant). Date: July 2, 2012. By: VICTORIA WHYTE. Victoria Whyte. Authorised Signatory for and on behalf of GlaxoSmithKline plc."

**20.** Victoria Whyte is the same individual who signed the Corporate Declaration attached as Docket 29 in this proceeding, in which she asserts under penalty of perjury that GSK plc "has

never researched, designed, developed, manufactured, marketed or sold any products or services anywhere in the world."

## V. EXHIBIT 4: DOJ CORPORATE INTEGRITY AGREEMENT EXCERPTS

**21.** Attached hereto as Exhibit 4 is a true and correct excerpt from the Corporate Integrity Agreement (CIA) issued as part of the 2012 DOJ settlement, publicly available at the Department of Justice website at:

**https://www.justice.gov/opa/documents/gsk/plea-ex-d.pdf**

**22.** The CIA is formally titled "Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and GlaxoSmithKline LLC." The formal contracting party on the GSK side is GlaxoSmithKline LLC.

**23.** However, within the CIA's operative text, the document imposes direct compliance obligations that run to the parent company, GlaxoSmithKline PLC. The CIA states that "The Compliance Officer shall be a member of senior management of GSK, and shall report directly to the Senior Vice President for Governance, Ethics, and Assurance of GlaxoSmithKline PLC (page 6), who, in turn, reports to the Chief Executive Officer of GlaxoSmithKline PLC"; and that the "Compliance Officer shall make periodic (at least quarterly) reports regarding compliance matters directly to the Board of GlaxoSmithKline PLC or any authorized committee thereof". The relevant pages of the CIA containing this and other relevant language is attached as Exhibit 4.

**24.** The compliance authority structure established by this federal enforcement instrument thus runs not only through GlaxoSmithKline LLC but through the executive and board of the UK parent entity, GlaxoSmithKline PLC. A passive holding company with no activity anywhere does not have its Senior Vice President for Governance, Ethics, and Assurance, and board, named as compliance principals in a federal enforcement instrument governing U.S. pharmaceutical conduct.

## VI. SUMMARY OF CONFLICTS WITH THE WHYTE DECLARATION

**25.** Based on my personal review of the documents described above, I have identified the following irreconcilable conflicts between Paragraph 6 of the Whyte Declaration and the public record:

**First:** The Study 716 CSR, bearing GlaxoSmithKline plc as document author in its PDF metadata, hosted publicly on GSK's French corporate domain at fr.gsk.com, and registered on GSK's own transparency platform, documents U.S. clinical research at 49 American centers, including a Seattle, Washington site, during 2000–2002. This directly contradicts the declaration's assertion that GSK plc has "never researched" products anywhere in the world.

**Second:** GlaxoSmithKline plc publicly announced the 2012 DOJ settlement as its own corporate resolution of U.S. government investigations into Paxil marketing, through sworn SEC filings executed by Ms. Whyte herself as Authorised Signatory for GSK plc.

This directly contradicts the declaration's assertion that GSK plc has "never marketed or sold" products anywhere.

**Third:** The DOJ Corporate Integrity Agreement, while formally between OIG and GlaxoSmithKline LLC, names the "Chief Executive Officer of GlaxoSmithKline PLC" and the "Board of GlaxoSmithKline PLC" as direct compliance principals, not a structure consistent with a passive holding company having no activity anywhere.

**26.** These conflicts arise from GSK plc's own corporate documents, its own sworn SEC filings, and a federal enforcement instrument. They cannot be resolved on the current record and establish a material factual dispute requiring jurisdictional discovery.

## VII. CERTIFICATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 26 day of June, 2026, at Edgewood, Washington.

[signature]

Dana Serine Greene

Plaintiff Pro Se

# Exhibit 1-

Study 716 Excerpts, Screenshot, MetaData

# Study 716 Excerpts

**Confidential**

The GlaxoSmithKline group of companies

**Paroxetine**

**BRL-029060**

**A Multicenter, Open-label, Six-Month Extension Study to Assess the Long-term Safety of Paroxetine in Children and Adolescents with Major Depressive Disorder (MDD) or Obsessive-Compulsive Disorder (OCD)**

Study 716
Study Initiation Date: 01 May 2000
Study Completion Date: 29 January 2002

Final Clinical Study Report

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Signatory: xxxxxxxxxx M.D.

SB Document Number: BRL-029060/RSD-101RLL/1

Issue Date: 16 September 2002

Copyright 2002 the GlaxoSmithKline group of companies. All rights reserved. Unauthorized copying or use of this information is prohibited.

**Table 1 (Continued) Investigators, the Assigned Center Number and the Investigator Hospital or University Affiliation and Location**

| Investigator | Center | Affiliated Institute | City/State |
|---|---|---|---|
| **United States** | | | |
| | 168 | | Seattle, WA |
| | | Mental Health | |
| | | | Lynn, MA |
| | | North Shore | |
| | 170 | | Atlanta, GA |
| MD | | | |
| | | | GA |
| | 176 | | |
| MD | | | KS |
| | | | Philadelphia, PA |
| | | Philadelphia | |
| | | | Orlando, FL |
| | | | Houston, TX |
| | 186 | | |
| | 201 | | Cleveland, OH |
| PhD | | | |
| | | | Boston, MA |
| | | Hospital | |
| | | | Salt Lake City, UT |
| | | | Shreveport, LA |
| **Canada** | | | |
| | 031 | | Halifax, Nova Scotia |
| | | Center | Halifax, Nova Scotia |

Source: Appendix A, Investigator CVs
*xxxxxxx was superseded as Principal Investigator by xxxxx xxxxx

Summaries of all adverse events during the open-label Treatment Phase, Taper Phase, and Follow-up Phase may be found in Section 12: Tables 15.1.1.1 and 15.1.1.1.X for open-label Treatment Phase-emergent adverse events; 15.1.1.2 and 15.1.1.2.X for Taper Phase-emergent adverse events; 15.1.1.3 and 15.1.1.3.X for combined open-label Treatment Phase-emergent and Taper Phase-emergent adverse events; 15.1.1.4 and 15.1.1.4.X for Follow-up Phase-emergent adverse events; 15.1.1.5 and 15.1.1.5.X for combined Taper Phase-emergent and Follow-up Phase-emergent adverse events; and 15.1.1.6 and 15.1.1.6.X for combined open-label Treatment Phase-emergent, Taper Phase-emergent and Follow-up Phase-emergent adverse events by body system and preferred term, and in descending order for AEs occurring in ≥1% of the population, respectively. Individual patient listings of adverse events may be found in Listings 15.1.1, Appendix D (Pre-Treatment and Treatment Phase) and 15.1.2, Appendix D (Taper, Follow-up, and Post-Follow-up Phases).

The incidence of adverse events was determined for serious and non-serious combined, regardless of investigator-deemed relationship to study medication.

There is a discrepancy in some cases between the dose at onset for an AE and the dosage at the time of the event per the dosing listings. The discrepancies occurred because the dose at the last scheduled visit was used to determine the dose at AE onset, even if the AE occurred after a dose change between visits (Listing 13.10.1, Appendix B; Listing 15.1.4, Appendix D). (See Section 13, Errata.)

### 5.2.1 Open-label Treatment Phase-emergent Adverse Events

Table 25 presents a summary of the most frequently reported (≥5% in the total population or in either acute-study treatment group within either age group) open-label Treatment Phase-emergent gender-non-specific adverse events, regardless of treatment attribution, for both age groups combined and separately. Open-label Treatment Phase-emergent adverse events are summarized in Tables 15.1.1.1, Section 12 (by body system and preferred term), and 15.1.1.1.X, Section 12 (by preferred term occurring in 1% or more of the population in descending order).

Overall, 75.7% (199/263) of patients reported a gender-non-specific emergent adverse event during the open-label Treatment Phase. The most common (≥10%) gender-non-specific adverse events were headache (25.1%, 66/263), respiratory disorder (18.3%, 48/263), trauma (13.7%, 36/263), infection (12.5%, 33/263), pharyngitis (10.6%, 28/263), and abdominal pain (10.3%, 27/263). The proportion of patients reporting at least one gender-non-specific adverse event during the open-label Treatment Phase was slightly higher in the acute-study

paroxetine group (79.7%, 106/133) than in the acute-study placebo group (71.5%, 93/130). Overall, the most common (≥10%) gender-non-specific adverse events for patients in the acute-study paroxetine group were headache (29.3%, 39/133), respiratory disorder and trauma (each 16.5%, 22/133), pharyngitis (13.5%, 18/133), infection (12.0%, 16/133), abdominal pain (11.3%, 15/133), and nausea (10.5%, 14/133), while the most common adverse events for patients in the acute-study placebo group were headache (20.8%, 27/130), respiratory disorder (20.0%, 26/130), infection (13.1%, 17/130), trauma (10.8%, 14/130), and nervousness (10.0%, 13/130).

Five adverse events occurred with an incidence of ≥5% in the acute-study paroxetine group and with an incidence of at least twice that in the acute-study placebo group: vomiting (9.8% [13/133] compared to 3.1% (4/130)], sinusitis (8.3% [11/133] compared to 1.5% [2/130]), emotional lability (7.5% [10/133] compared to 3.1% (4/130)], diarrhea (6.8% [9/133] compared to 2.3% [3/130]), and albuminuria (6.0% [8/133] compared to 1.5% [2/130]). In the paroxetine group, the verbatim terms for the 10 occurrences of emotional lability were 2 suicidal ideation, 2 attempted suicide, and one each wound right hand self-inflicted with pencil, consumed 10 tabs of Aleve, suicidal, heightened emotions, increased weeping, and unstable mood. In the placebo group, the verbatim terms for the 4 occurrences of emotional lability were mood swing, mood swings/patient cut on self wrist/cut on self upper thighs bilateral, hospitalization for suicide attempt, and emotional crisis. No adverse event occurred with an incidence of ≥5% in the acute-study placebo group and with an incidence of at least twice that in the acute-study paroxetine group.

The overall frequency of gender-non-specific adverse events was slightly higher among children than adolescents. A total of 78.4% (109/139) of children reported gender-non-specific adverse events during the open-label Treatment Phase: 80.6% (54/67) of patients in the acute-study paroxetine group and 76.4% (55/72) of patients in the acute-study placebo group. A total of 72.6% (90/124) of adolescents reported gender-non-specific adverse events during the open-label Treatment Phase: 78.8% (52/66) of patients in the acute-study paroxetine group and 65.5% (38/58) of patients in the acute-study placebo group.

The nature of the adverse events was generally similar between children and adolescents but there were some differences in the rates of occurrence of individual AEs. Adverse events that occurred in children with an incidence of ≥5% and with an incidence of at least twice that in adolescents were pharyngitis (14.4% [20/139] compared to 6.5% [8/124]), hyperkinesia (8.6% [12/139] compared to 2.4% [3/124]), vomiting (8.6% [12/139] compared to 4.0% [5/124]), otitis media

The number and percentage of patients with emergent adverse events during the Follow-up Phase by intensity are summarized in Tables 15.1.3.4, Section 12 (by body system and preferred term) and 15.1.3.4.X, Section 12 (by preferred term occurring in 1% or more of the population in descending order). In addition, Follow-up Phase-emergent adverse events are summarized by maximum intensity by body system and preferred term in Table 15.1.7.4, Section 12. Per-patient details may be found in Listing 15.1.2, Appendix D. In Listing 15.1.2, patient 716.026.27047 has an AE of dehydration that has a missing intensity (see Section 13, Errata).

One patient in the acute-study placebo group had a Follow-up Phase-emergent adverse event that was considered severe by the investigator. Patient 716.026.27047, a 10-year-old male, had a viral infection 1 day after the last dose of open-label study medication. This event, which lasted 7 days, was considered by the investigator to be unrelated to study medication.

## 5.3 Deaths

There were no deaths during the study, and no deaths have been reported since the completion of the study (Listing 15.1.5, Appendix D).

## 5.4 Serious Adverse Events

A serious adverse event was defined as any event that is fatal, life threatening, disabling/incapacitating or resulted in hospitalization,[3] prolonged a hospital stay or was associated with congenital abnormality, cancer or overdose (either accidental or intentional). In addition, any event that the investigator regarded as serious or that would suggest any significant hazard, contraindication, side effect or precaution that may be associated with the use of the study medication was documented as a serious adverse event. Important medical events that may not result in death, be life-threatening, or require hospitalization may be considered a serious adverse drug event when, based upon appropriate medical judgment, they may jeopardize the patient or patients and may require medical or surgical intervention to prevent one of the outcomes listed in this definition. Pregnancy

---

[3] Elective surgery or routine clinical procedures that required hospitalization but were not the result of an adverse event, and were completed without complication as planned, were not to be considered as adverse events and were to be recorded on the medical procedures page of the CRF.

was to be captured as a serious adverse event for the purpose of tracking the status of pregnancies to term; however, no pregnancies occurred during the course of the study.

The number of patients with serious adverse events emergent during the open-label Treatment Phase, Taper Phase or Follow-up Phase by body system and preferred term by primary diagnosis and acute-study treatment group is presented in Table 15.1.2.1, Section 12. Listings of patients with serious emergent adverse events during the open-label Treatment Phase, Taper Phase, Follow-up Phase or post-Follow-up Phase are provided in Listings 15.1.3.2 and 15.1.3.3, Appendix D.

The number and percentage of patients with non-fatal serious emergent adverse events during the open-label Treatment, Taper, or Follow-up Phase are presented by acute-study treatment group in Table 38. Overall, 5.7% (15/265) of patients reported at least one serious adverse event during the open-label Treatment Phase or Taper Phase or within 30 days of the last dose of open-label study medication (including taper). (Note: the total number of patients includes two patients in the acute-study paroxetine group who had no post-baseline assessments in Study 716 and thus are not included in the ITT population).

The most common serious adverse event was emotional lability, occurring in 2.3% (6/265) of patients entered into the study. Verbatim terms that coded to a preferred term of emotional lability were suicidal ideation (2 patients), attempted suicide (2 patients) and suicidal (1 patient) in the acute-study paroxetine group, and hospitalization for suicide attempt (1 patient) in the acute-study placebo group. One patient (716.013.00701) in the acute-study paroxetine group had two episodes of emotional lability; only one is counted in Table 38. No other specific SAE was experienced by more than 2 patients. Of the 18 serious adverse events reported (including both episodes of emotional lability in one patient), 14 occurred during the open-label Treatment Phase. The majority of serious adverse events were judged moderate or severe in intensity and unrelated to open-label study medication (Listings 15.1.3.2 and 15.1.3.3, Appendix D). No gender-specific serious adverse events were reported for either acute-study treatment group.

The proportion of patients reporting at least one serious adverse event was similar between the two acute-study treatment groups: 5.9% (8/135) of patients in the acute-study paroxetine group and 5.4% (7/130) of patients in the acute-study placebo group. The proportion of patients with emotional lability was higher in the acute-study paroxetine group (3.7%, 5/135) than in the acute-study placebo group (0.8%, 1/130). The number of children with serious adverse events during

| Table/Listing | Error |
| --- | --- |
| Interim Table 15.1.5.1, Section 12; Interim Listing 15.1.4, Appendix D; Interim Table 15.1.8, Section 12; Interim Listings 15.1.1 and 15.1.3.2, Appendix D | Patient 716.020.25458 had a serious adverse event of psychosis that led to withdrawal from the study. reported at Study 716 Baseline. The event was reported in the interim report for this study as having led to a dose reduction. |
| Listing 13.9.1, Appendix B; Listings 15.1.1 and 15.1.3.2, Appendix D | Patient 716.025.25802 is listed as taking citalopram for an adverse event of homicidal mutilation to self. No corresponding adverse event is listed in the adverse event table. |

# Study 716 Screenshot

fr.gsk.com

https://fr.gsk.com/m...



**Confidential**

The GlaxoSmithKline group of companies

**Paroxetine**

**BRL-029060**

**A Multicenter, Open-label, Six-Month Extension Study to Assess the Long-term Safety of Paroxetine in Children and Adolescents with Major Depressive Disorder (MDD) or Obsessive-Compulsive Disorder (OCD)**

Study 716
Study Initiation Date: 01 May 2000
Study Completion Date: 29 January 2002

Final Clinical Study Report

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Signatory: xxxxxxxxxx M.D.

SB Document Number: BRL-029060/RSD-101RLL/1

Issue Date: 16 September 2002

Copyright 2002 the GlaxoSmithKline group of companies. All rights reserved. Unauthorized copying or use of this information is prohibited.



**Signature Page**

# Study 716 MetaData

depression_716_final...

**depression_716_final_...** 6.6 MB

Modified: May 25, 2026 at 1:51 PM

Add Tags...

General:

Kind: PDF document
Size: 6,604,435 bytes (6.6 MB on disk)
Where: iCloud Drive ▸ Paxil case
Created: Monday, May 25, 2026 at 1:51 PM
Modified: Monday, May 25, 2026 at 1:51 PM

Stationery pad

Locked

More Info:

Last opened: June 11, 2026 at 2:44 PM
Title: GSK - Study 716 - paroxetine
Authors: GlaxoSmithKline plc
Description: GSK - Study 716 - paroxetine
Version: 1.6
Pages: 2,405
Resolution: 612×792
Security: None

Name & Extension:

Comments:

Open with:

Preview:



BRL-029060/RSD-101RLL/1/CPMS-716 000001

**Confidential**

The GlaxoSmithKline *group of companies*

**Paroxetine**

**BRL-029060**

**A Multicenter, Open-label, Six-Month Extension Study to Assess the Long-term Safety of Paroxetine in Children and Adolescents with Major Depressive Disorder (MDD) or Obsessive-Compulsive Disorder (OCD)**

Study 716
Study Initiation Date: 01 May 2000
Study Completion Date: 29 January 2002

Final Clinical Study Report

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Signatory: xxxxxxxxxx M.D.

SB Document Number: BRL-029060/RSD-101RLL/1

Issue Date: 16 September 2002

Copyright 2002 the GlaxoSmithKline group of companies. All rights reserved. Unauthorized copying or use of this information is prohibited.

Sharing & Permissions:

# Exhibit 2-

GSK Study Register Screenshot

Safari File Edit View History Bookmarks Window Help Tue May 26 5:28 PM
gsk-studyregister.com
GSKTrial ID 29060/716



Last updated: 11/07/2018 14:13:33

# A Multi-center, Open-label, Six-Month Extension Study to Assess the Long-term Safety of Paroxetine in Children and Adolescents with Major Depressive Disorder (MDD) or Obsessive Compulsive Disorder (OCD)

Contact us about the trial

Request patient level data

| GSK study ID | Clinicaltrials.gov ID | EudraCT ID | EU CT Number | Trial status |
|---|---|---|---|---|
| 29060/716 | Not applicable | Not applicable | Not applicable | Study complete |

See study documents

# Exhibit 3-

## GSK plc SEC FORM 6-K, JULY 2, 2012

**FORM 6-K**

**SECURITIES AND EXCHANGE COMMISSION**
**Washington D.C. 20549**

**Report of Foreign Issuer**

**Pursuant to Rule 13a-16 or 15d-16 of**
**the Securities Exchange Act of 1934**

For period ending July 2012

**GlaxoSmithKline plc**
(Name of registrant)

**980 Great West Road, Brentford, Middlesex, TW8 9GS**
(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports under cover Form 20-F or Form 40-F

Form 20-F x     Form 40-F

--

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934.

Yes     No x

--

Issued: Monday 2 July 2012, London UK & Philadelphia, US

# GlaxoSmithKline concludes previously announced agreement in principle to resolve multiple investigations with US Government and numerous states

- **Final settlement of $3bn covered by existing legal provisions announced in November 2011**

- **Fundamental changes to US compliance, marketing and selling procedures implemented in recent years**

GlaxoSmithKline plc (GSK) today announced that it has reached an agreement with the US Government, multiple states and the District of Columbia to conclude the Company's most significant ongoing Federal government investigations. The final settlement is a result of negotiations which reached agreement in principle in November 2011. GSK will make payments totalling $3bn which are covered by existing provisions and will be funded through existing cash resources.

The agreement resolves criminal and civil liabilities related to: an investigation begun by the US Attorney's office of Colorado in 2004 and later taken over by the US Attorney's Office of Massachusetts into GSK's sales and marketing practices for nine products; the U.S. Department of Justice's investigation of possible inappropriate use of the nominal price exception under the Medicaid Rebate Program; and the Department of Justice's investigation of the marketing and regulatory submissions of Avandia.

As part of the agreement, GSK has entered into a corporate integrity agreement (CIA) with the Office of Inspector General (OIG) of the U.S. Department of Health and Human Services. The CIA will also cover a portion of GSK's manufacturing operations, related to the company's settlement in 2010 on events in the early 2000s at GSK's former manufacturing facility in Cidra, Puerto Rico. In both areas, the CIA will build on the company's existing comprehensive compliance programmes.

**Commenting on the agreement, GlaxoSmithKline CEO Sir Andrew Witty said:** "Today brings to resolution difficult, long-standing matters for GSK. Whilst these originate in a different era for the company, they cannot and will not be ignored. On behalf of GSK, I want to express our regret and reiterate that we have learnt from the mistakes that were made.

"We are deeply committed to doing everything we can to live up to and exceed the expectations of those we work with and serve. Since I became CEO, we have had a clear priority to ingrain a culture of putting patients first, acting transparently, respecting people inside and outside the organisation and displaying integrity in everything we do.

"In the US, we have taken action at all levels in the company. We have fundamentally changed our procedures for compliance, marketing and selling. When necessary, we have removed employees who have engaged in misconduct. In the last two years, we have reformed the basis on which we pay our sales representatives and we have enhanced our ability to 'claw back' remuneration of our senior management.

"We have a vital role to play in bringing innovative medicines to patients and we understand how important it is that our medicines are appropriately promoted to healthcare professionals and that we adhere to the standards rightly expected by the US Government."

Under the terms of the settlement, GSK will plead guilty to misdemeanor violations of the Federal Food, Drug, and Cosmetic Act related to certain aspects of the marketing of Paxil for paediatric use and of Wellbutrin for certain uses, and for failure to include information about the initiation or status of certain Avandia studies in Periodic and Annual Reports submitted to FDA.

# GlaxoSmithKline concludes previously announced agreement in principle to resolve multiple investigations with US Government and numerous states

- **Final settlement of $3bn covered by existing legal provisions announced in November 2011**

- **Fundamental changes to US compliance, marketing and selling procedures implemented in recent years**

GlaxoSmithKline plc (GSK) today announced that it has reached an agreement with the US Government, multiple states and the District of Columbia to conclude the Company's most significant ongoing Federal government investigations. The final settlement is a result of negotiations which reached agreement in principle in November 2011. GSK will make payments totalling $3bn which are covered by existing provisions and will be funded through existing cash resources.

The agreement resolves criminal and civil liabilities related to: an investigation begun by the US Attorney's office of Colorado in 2004 and later taken over by the US Attorney's Office of Massachusetts into GSK's sales and marketing practices for nine products; the U.S. Department of Justice's investigation of possible inappropriate use of the nominal price exception under the Medicaid Rebate Program; and the Department of Justice's investigation of the marketing and regulatory submissions of Avandia.

As part of the agreement, GSK has entered into a corporate integrity agreement (CIA) with the Office of Inspector General (OIG) of the U.S. Department of Health and Human Services. The CIA will also cover a portion of GSK's manufacturing operations, related to the company's settlement in 2010 on events in the early 2000s at GSK's former manufacturing facility in Cidra, Puerto Rico. In both areas, the CIA will build on the company's existing comprehensive compliance programmes.

**Commenting on the agreement, GlaxoSmithKline CEO Sir Andrew Witty said:** "Today brings to resolution difficult, long-standing matters for GSK. Whilst these originate in a different era for the company, they cannot and will not be ignored. On behalf of GSK, I want to express our regret and reiterate that we have learnt from the mistakes that were made.

"We are deeply committed to doing everything we can to live up to and exceed the expectations of those we work with and serve. Since I became CEO, we have had a clear priority to ingrain a culture of putting patients first, acting transparently, respecting people inside and outside the organisation and displaying integrity in everything we do.

"In the US, we have taken action at all levels in the company. We have fundamentally changed our procedures for compliance, marketing and selling. When necessary, we have removed employees who have engaged in misconduct. In the last two years, we have reformed the basis on which we pay our sales representatives and we have enhanced our ability to 'claw back' remuneration of our senior management.

"We have a vital role to play in bringing innovative medicines to patients and we understand how important it is that our medicines are appropriately promoted to healthcare professionals and that we adhere to the standards rightly expected by the US Government."

Under the terms of the settlement, GSK will plead guilty to misdemeanor violations of the Federal Food, Drug, and Cosmetic Act related to certain aspects of the marketing of Paxil for paediatric use and of Wellbutrin for certain uses, and for failure to include information about the initiation or status of certain Avandia studies in Periodic and Annual Reports submitted to FDA.

The civil settlement reached with the Government does not constitute an admission of any liability or wrongdoing in the selling and marketing of Lamictal, Zofran, Imitrex, Lotronex, Flovent, Valtrex, Avandia or Advair products, nor in its nominal pricing practices.

GSK has made fundamental changes to its procedures for compliance, marketing and selling in the US over the last few years. The company has adopted new policies, enhanced others, and implemented measures to strengthen training and compliance programs, including adding compliance staff. Since January 2011, the company has put in place a new incentive compensation system for GSK professional sales representatives who work directly with health care professionals. The new system eliminates individual sales targets as a basis for bonuses, and instead bases incentive compensation on the quality of the service these representatives deliver to customers to support improved patient health.

These changes ensure that the company's programs and activities are well-controlled and aligned with the evolving expectation of its stakeholders. Most importantly, the changes are in keeping with the company's core values, ensuring that its activities and relationships are transparent, based on integrity and respect, and focused on the best interests of patients. The Company's US Commercial Practices Policies now meet or exceed the US PhRMA Code governing interactions with healthcare professionals.

The finalisation of the terms of the settlement mean that this matter can be resolved within the existing pre-tax provision. The after tax cost will be approximately $150m lower than provided. As a result a credit will be recorded to the non-core tax charge for the second quarter 2012.

However, due to the evolving state litigation environment, GSK expects to utilise the tax benefit arising in recording an offsetting additional pre-tax provision of approximately $180m (equating to an after tax cost of $150m) related to these matters. This will be recorded as a non-core charge in SG&A in Q212.

The net effect of these movements on total earnings is expected to be neutral. The overall legal provision held for all matters across the Group will be reviewed as part of the company's standard quarterly close process.

**V A Whyte**
**Company Secretary**
**2 July 2012**

**GlaxoSmithKline** - one of the world's leading research-based pharmaceutical and healthcare companies - is committed to improving the quality of human life by enabling people to do more, feel better and live longer. For further information please visit www.gsk.com.


| **GlaxoSmithKline Enquiries:** | | | |
|---|---|---|---|
| UK Media enquiries: | David Mawdsley<br>Stephen Rea<br>Sarah Spencer<br>David Daley | +44 (0) 20 8047 5502<br>+44 (0) 20 8047 5502<br>+44 (0) 20 8047 5502<br>+44 (0) 20 8047 5502 | (London)<br>(London)<br>(London)<br>(London) |
| US Media enquiries: | Kevin Colgan<br>Mary Anne Rhyne | +1 919 483 2933<br>+1 919 483 0492 | (North Carolina)<br>(North Carolina) |
| Analyst/Investor enquiries: | Sally Ferguson<br>Tom Curry<br>Gary Davies<br>James Dodwell | +44 (0) 20 8047 5543<br>+ 1 215 751 5419<br>+ 44 (0) 20 8047 5503<br>+ 44 (0) 20 8047 2406 | (London)<br>(Philadelphia)<br>(London)<br>(London) |

| | | | |
|---|---|---|---|
| | Jeff McLaughlin<br>Ziba Shamsi | + 1 215 751 7002<br>+ 44 (0) 20 8047 3289 | (Philadelphia)<br>(London) |

**Cautionary statement regarding forward-looking statements**
Under the safe harbor provisions of the U.S. Private Securities Litigation Reform Act of 1995, GSK cautions investors that any forward-looking statements or projections made by GSK, including those made in this announcement, are subject to risks and uncertainties that may cause actual results to differ materially from those projected. Factors that may affect GSK' s operations are described under 'Risk factors' in the 'Financial review & risk' section in the company's Annual Report 2011 included as exhibit 15.2 to the company's Annual Report on Form 20-F for 2011.

**Registered in England & Wales:**
No. 3888792

**Registered Office:**
980 Great West Road
Brentford, Middlesex
TW8 9GS

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorised.

**GlaxoSmithKline plc**
(Registrant)

Date: July 2, 2012

By: VICTORIA WHYTE
------------------

Victoria Whyte
Authorised Signatory for and on
behalf of GlaxoSmithKline plc

# Exhibit 4-

## DOJ Corporate Integrity Agreement Excerpts

# CORPORATE INTEGRITY AGREEMENT
## BETWEEN THE
## OFFICE OF INSPECTOR GENERAL
## OF THE
## DEPARTMENT OF HEALTH AND HUMAN SERVICES
## AND
## GLAXOSMITHKLINE LLC

## I. PREAMBLE

GlaxoSmithKline LLC (GSK) hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements) and with the statutes, regulations, and written directives of the Food and Drug Administration (FDA requirements).

Contemporaneously with this CIA, GSK is entering into Settlement Agreements with the United States. GSK will also enter into settlement agreements with various States (State Settlement Agreements) and GSK's agreement to this CIA is a condition precedent to those agreements. Effective October 26, 2010, GSK entered into a Settlement Agreement with the United States to resolve allegations regarding certain drugs manufactured at SB Pharmco's Cidra, Puerto Rico facility.

Prior to the Effective Date of this CIA (as defined below), GSK and GSK Affiliates (as defined below in Section II.C.10) established a worldwide voluntary compliance program designed to address the companies' operations globally. In the United States, the compliance program is designed to address, among other things, compliance with Federal health care program and FDA requirements (Compliance Program).

GSK shall continue its Compliance Program throughout the term of this CIA and shall do so in accordance with the terms set forth below. GSK may modify its Compliance Program as appropriate, but, at a minimum, GSK shall ensure that during the term of this CIA, it shall comply with the obligations set forth herein.

care program and FDA requirements. The Compliance Officer shall be a member of senior management of GSK, and shall report directly to the Senior Vice President for Governance, Ethics, and Assurance of GlaxoSmithKline PLC who, in turn, reports to the Chief Executive Officer of GlaxoSmithKline PLC. The Compliance Officer shall make periodic (at least quarterly) reports regarding compliance matters directly to the Board of GlaxoSmithKline PLC or any authorized committee thereof (hereinafter, "the Board"), and shall be authorized to report on such matters to the Board at any time. The Compliance Officer shall not be or be subordinate to the General Counsel or Chief Financial Officer. The Compliance Officer shall be responsible for monitoring the day-to-day compliance activities engaged in by GSK as well as for any reporting obligations created under this CIA. Any noncompliance job responsibilities of the Compliance Officer shall be limited and must not interfere with the Compliance Officer's ability to perform the duties outlined in this CIA.

GSK shall report to OIG, in writing, any change in the identity of the Compliance Officer, or any actions or changes that would affect the Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, within five days after such a change.

2. *Compliance Committee.* Prior to the Effective Date, GSK formed compliance committee known as the NA Pharma Risk Management & Compliance Board (hereafter "Compliance Committee") which, in conjunction with the Compliance Officer, assists in the implementation and enhancement of the Compliance Program. GSK shall continue the Compliance Committee during the term of this CIA. The Compliance Committee shall, at a minimum, include the Compliance Officer and other members of senior management necessary to meet the requirements of this CIA (e.g., senior executives of relevant departments, such as such as legal, Medical Affairs, regulatory affairs, sales, marketing, human resources, research and development, global manufacturing quality control, and operations.) In addition, GSK's Audit function provides regular reports to the Compliance Committee. The Compliance Officer and the President of GSK shall co-chair the Compliance Committee. The Compliance Committee shall support the Compliance Officer in fulfilling his/her responsibilities (e.g., shall assist in the analysis of the GSK's risk areas and shall oversee monitoring of internal and external compliance-related audits and investigations). The Compliance Committee shall meet at least quarterly.

GSK shall report to OIG, in writing, any changes in the composition of the Compliance Committee, or any actions or changes that would affect the Compliance