_____ FILED _____ LODGED
_____ RECEIVED
JUL 17 2026
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY DEPUTY

_____ FILED _____ LODGED
_____ RECEIVED
JUL 17 2026

Honorable Tiffany M. Cartwright
United States District Court,
Western District of Washington
Case No: 3:25-cv-05357-TMC
Plaintiff: Dana Serine Greene
Defendant: GSK plc. (formerly GlaxoSmithKline)

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY**

NOTE ON MOTION CALENDAR: FRIDAY, JULY 17, 2026

## I. INTRODUCTION

Defendant's Response does not dispute Study 716's PDF metadata identifying GlaxoSmithKline plc as document author. It recharacterizes the metadata as "supposed" and argues that "Exhibit 1 does not identify GSK plc as the study sponsor." Resp. at 5. Defendant likewise does not dispute that Victoria Whyte signed a 2012 SEC Form 6-K "for and on behalf of GlaxoSmithKline plc" (Greene Decl. ¶ 19), announcing that entity's resolution of a U.S. government investigation into Paxil marketing; the same conduct the Whyte Declaration now denies GSK plc ever engaged in. Plaintiff submits with this Reply excerpts from GlaxoSmithKline plc's 2000 Annual Report directly answering Defendant's sponsorship argument: GlaxoSmithKline plc was "engaged in the creation and discovery, development, manufacture and marketing of pharmaceutical products." Sponsorship does not begin and end at financial support.

Defendant raises three arguments in opposition: (1) Plaintiff's exhibits are insufficiently authenticated, (2) Study 716 cannot support specific jurisdiction because it post-dates Plaintiff's prescription and a single clinical site cannot support general jurisdiction, and (3) the CIA was

contracted by GlaxoSmithKline LLC, a separate entity from GSK plc. None resolves the conflict between GSK plc's own corporate disclosures and the categorical denial in Paragraph 6 of the Whyte Declaration. Defendant's authentication challenge conflates three distinct evidentiary questions: provenance, admissibility as party admissions, and corporate identity.

## II. GSK PLC'S OWN ANNUAL REPORT ANSWERS DEFENDANT'S SPONSORSHIP ARGUMENT AND IS INDEPENDENTLY ADMISSIBLE AS A PARTY ADMISSION

Plaintiff submits with this Reply excerpts from GlaxoSmithKline plc's 2000 Annual Report (Exhibit 5) and requests judicial notice of its existence, authenticity, and contents under FRE 201, as a corporate disclosure not subject to reasonable dispute. Plaintiff independently offers the statements therein as party admissions under FRE 801(d)(2)(A). These are distinct theories: FRE 201 establishes the document is what it purports to be; Rule 801(d)(2)(A) establishes that its substantive statements are GSK plc's own admissions, not subject to hearsay exclusion, without requiring the Court to judicially notice the truth of every factual assertion in the Report.

The Annual Report expressly defines "the company" as GlaxoSmithKline plc. (Ex. 5 at 5.) The Report states that "GlaxoSmithKline plc, and its subsidiary and associated undertakings, constitute a major global healthcare group engaged in the creation and discovery, development, manufacture and marketing of pharmaceutical products," and identifies an "operational headquarters in Philadelphia, USA." (Ex. 5 at 6.) It further states that "the global biological and pharmaceutical Research and Development (R&D) function in GlaxoSmithKline is responsible for the generation of information and the acquisition of knowledge required to discover, develop, register, commercialise and effectively market" its products, and lists year 2000 FDA submissions for "Seroxat/Paxil." (Ex. 5 at 14.) The Board of GlaxoSmithKline plc, the Report states, "is ultimately accountable for the Group's activities." (Ex. 5 at 32.)

These are Defendant's own words, in its own corporate voice, issued to shareholders and regulators in the same year the relevant conduct occurred. Plaintiff does not ask the Court to accept every assertion in the Annual Report as objectively true. The purpose is targeted: GSK plc represented itself one way to shareholders and regulators and presents a materially different description to this Court. GSK plc cannot simultaneously hold itself out as a global healthcare group "engaged in the creation and discovery, development, manufacture and marketing of pharmaceutical products" and assert under penalty of perjury that it has "never researched, designed, developed, manufactured, marketed or sold any products or services anywhere in the world." (Dkt. 29 ¶ 6.) That irreconcilable conflict is not an authentication question. It is a credibility question about the Whyte Declaration itself, and is a material factual dispute that jurisdictional discovery exists to resolve.

## III. DEFENDANT'S AUTHENTICATION CHALLENGE PRESENTS THREE DISTINCT EVIDENTIARY QUESTIONS

Defendant argues that "Plaintiff's self-stipulation to authenticity does not guarantee that these documents are true and accurate, final copies of records." Resp. at 3. This objection treats exhibits with different admissibility frameworks as interchangeable. Plaintiff addresses each separately.

### A. Provenance of Exhibit 1

Defendant characterizes Exhibit 1 as an unauthenticated internet document. It is not. Plaintiff obtained Study 716 directly from GSK's French corporate website (fr.gsk.com), a GSK-controlled domain, where GSK made the document available without restriction. Plaintiff's declaration establishes the date of access, the precise URL, the identifying information displayed on the document itself, and the embedded PDF metadata naming GlaxoSmithKline plc as author. The document also appears on GSK's own clinical study register. Defendant does not contend the document is altered, fabricated, or not hosted by GSK. Defendant's opposition challenges sponsorship. It does not deny hosting. Those are different propositions.

The failure to deny hosting carries independent evidentiary significance. A company that places a clinical study report on its own corporate domain, indexed through its own study register, and makes it publicly available without restriction has manifested adoption of that document as its own. That is an adoptive admission under FRE 801(d)(2)(B); substantive admissibility grounded in GSK's own conduct, not in Plaintiff's authentication declaration alone. Even if Defendant disputes who sponsored the study, it must account for why it chose to host and publish the document, why GSK plc's name appears in its metadata, and how those facts are consistent with the categorical denial in the Whyte Declaration.

**B. Party Admissions: Exhibits 3 and 5**

Exhibit 3 and 5 each carry admissibility grounds independent of authentication.

As to Exhibit 3: The 6-K was retrieved from the SEC's EDGAR database. Federal courts routinely take judicial notice of SEC filings under FRE 201(b)(2) as facts accurately and readily determined from sources whose accuracy cannot reasonably be questioned; Plaintiff requests the Court do so here. Independently, the 6-k bears Victoria Whyte's signature as "Authorised Signatory for and on behalf of GlaxoSmithKline plc." That signatory block is authorization printed on the face of the document itself. The statements within are therefore admissible under FRE 801(d)(2)(C) as statements by a person the party authorized to speak on its behalf; direct party admissions, not subject to hearsay exclusion, requiring no personal authentication by Plaintiff.

As to Exhibit 5: The Annual Report is subject to judicial notice under FRE 201 and independently admissible as a party admission under FRE 801(d)(2)(A), as addressed in Section II. The two theories are cumulative. The Court is not asked to notice the objective truth of every assertion, but to recognize that GSK plc made these statements in its own corporate voice; admissible against it as its own admissions.

**C. Corporate Identity Inconsistency**

Taken together, Exhibits 3 and 5 do not present merely an authentication dispute. They present an irreconcilable corporate identity problem. The Whyte Declaration asks the Court to treat GSK plc as an entity that has never "researched, designed, developed, manufactured, marketed or sold any products or services anywhere in the world", and yet GSK plc's own 2000 Annual Report, issued the same year the conduct occurred, in the same corporate name, describes a global healthcare group engaged in research, development, manufacture, and marketing of pharmaceutical products, with U.S. operational headquarters and Paxil regulatory submissions to the FDA. Victoria Whyte's 2012 6-K signature confirms her authorization to speak for GlaxoSmithKline plc in a Paxil-marketing investigation. The question is not whether Plaintiff can authenticate internet documents. It is how GSK plc reconciles its own public statements with the categorical assertion in the Whyte Declaration.

## IV. THE TIMING OF STUDY 716 DOES NOT DEFEAT ITS RELEVANCE

Defendant argues that Study 716 "cannot be forum-related conduct sufficient to confer specific personal jurisdiction" because it "occurred... after she alleges being prescribed Paxil." Resp. at 7. This argument addresses specific jurisdiction and the prescription's onset date; it does not address the ongoing conduct at issue. Plaintiff's fraud claim rests on Defendant's continuing use of a specific adverse-event classification mechanism: coding suicidal ideation and self-harm as "emotional lability", a mechanism Study 716 documents during the identical period.

Plaintiff submits with this Reply a supplemental declaration authenticating Exhibit 6: a May 2001 school-district health evaluation record obtained through a formal medical records request. The record reflects a diagnosis of Generalized Anxiety Disorder and ADHD, and identifies "Emotional lability" as an effect of Plaintiff's health condition and/or medication; the identical term Study 716 applies to suicidal ideation and self-harm. This record was created in Washington, during the same period Study 716 was an active clinical trial. It corroborates that the classification mechanism

Defendant elsewhere characterizes as "a new, merits-based argument" having "nothing to do with the threshold question of personal jurisdiction," Resp. at 6, was operating in the forum state contemporaneously with Defendant's own study, supporting both the ongoing-concealment theory underlying Plaintiff's fraud claim and the continuous, systematic conduct relevant to general jurisdiction. Plaintiff does not offer this record to establish medical causation, but to corroborate that the pattern documented in Study 716 was live in Washington during the relevant period.

## V. THE WHYTE-SIGNATURE CONFLICT REMAINS UNADDRESSED ON ITS OWN TERMS

Defendant does not dispute that Victoria Whyte signed the July 2, 2012 SEC Form 6-K "for and on behalf of GlaxoSmithKline plc" (Greene Decl. ¶ 19, Ex. 3), announcing that entity's own resolution of the Paxil-marketing investigation; the same officer, the same conduct, the same entity Whyte's declaration now says never marketed anything anywhere. Defendant's argument that "GSK plc and GSK LLC are separate entities," Resp. at 6, is directed only at the Corporate Integrity Agreement (Exhibit 4); it neither replies to nor resolves the Whyte signature conflict in Exhibit 3.

## VI. CONCLUSION

The exhibits before the Court, including those submitted with this Reply, present a documented, textual conflict between GSK plc's own corporate disclosures and the categorical denial in the Whyte Declaration. Defendant's Response does not resolve that conflict. Plaintiff respectfully requests that the Court grant the Motion for Leave to Conduct Jurisdictional Discovery.

*I certify that this memorandum contains 1,658 words, in compliance with the Local Civil Rules.*

DATED this 17 day of July, 2026.

Respectfully submitted,

**Dana Serine Greene**

Plaintiff Pro Se
5007 Monta Vista Drive East, Edgewood WA 98372
dfserine@gmail.com
206-795-2063

**CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below, I caused the foregoing document to be filed with the Clerk of the Court at the Tacoma Clerk's Office, and that a copy will be served on all counsel of record via the CM/ECF notification system.

Dana Serine Greene
Plaintiff Pro Se

Signed: ____________________

Dated: 07-17-2026

# Exhibit 5-

GlaxoSmithKline plc's 2000 Annual Report Excerpts

Full report available at: https://www.gsk.com/media/gejnj0ya/annual-report-2000.pdf

# GlaxoSmithKline plc
# Annual Report
**for the year ended 31st December 2000**

## Contents

**Report of the Directors**

02 Financial summary
03 Joint statement by the Chairman and the Chief Executive Officer
05 Description of business
29 Corporate governance
37 Remuneration report
47 Operating and financial review and prospects

69 **Financial statements**

70 Directors' statements of responsibility
71 Report by the auditors
72 Consolidated statement of profit and loss
72 Consolidated statement of total recognised gains and losses
74 Consolidated statement of cash flow
76 Consolidated balance sheet
76 Reconciliation of movements in equity shareholders' funds
77 Company balance sheet
78 Notes to the financial statements
136 Group companies
142 Principal financial statements in US$
144 Financial record

153 **Investor information**

154 Shareholder return
156 Taxation information for shareholders
157 Shareholder information
158 Share capital

160 Cross reference to Form 20-F
162 Glossary of terms
163 Index

Contact details

The Annual Report was approved by the Board of Directors on 22nd March 2001 and published on 12th April 2001.

# Description of business

The Description of business discusses the activities, the resources and the operating environment of the business and identifies developments and achievements in 2000, under the following headings:

**The business**
06 History and development of the company
07 Products

**Operating environment**
10 Competition
11 Regulation

**Operating activities**
12 Marketing and distribution
13 Manufacture and supply
14 Research and development

**Operating resources**
22 Intellectual property
23 Information technology
24 GlaxoSmithKline people
24 Property, plant and equipment

**The business and the community**
25 Environment, health and safety
26 Global community partnerships
28 Access to medicines

Discussion of the Group's management structures and corporate governance procedures is set out in Corporate governance (pages 29 to 36).

Discussion of the Group's operating and financial performance and financial resources is given in the Operating and financial review and prospects (pages 47 to 68).

---

In this report: 'GlaxoSmithKline' or the 'Group' means GlaxoSmithKline plc and its subsidiary and associated undertakings and the 'company' means GlaxoSmithKline plc; 'GlaxoSmithKline share' means an Ordinary Share of GlaxoSmithKline plc of 25p.

Throughout this report, figures quoted for market size, market share and market growth rates relate to the year ended 30th September 2000 (or later where available). These are GlaxoSmithKline estimates based on the most recent data from independent external sources, valued in sterling at relevant exchange rates. Figures quoted for product market share reflect sales by GlaxoSmithKline and licensees.

Brand names appearing in italics throughout this report are trade marks of GlaxoSmithKline plc, its subsidiaries or associated companies, with the exception of *Nicoderm*, a trade mark of Hoechst Marion Roussel Inc; *Bexxar*, a trade mark of Corixa Corporation, Inc; *Coreg*, a trade mark under licence from Roche Laboratories, Inc; *Factive*, a trade mark of LG Chemical, Ltd; *Navelbine*, a trade mark of Pierre Fabré Médicament and *Panorex*, a trade mark of Centocor, Inc, all of which are used under licence by the Group.

# Description of business

The Description of business discusses the activities, the resources and the operating environment of the business and identifies developments and achievements in 2000, under the following headings:

The business
06 History and development of the company
07 Products

Operating environment
10 Competition
11 Regulation

Operating activities
12 Marketing and distribution
13 Manufacture and supply
14 Research and development

Operating resources
22 Intellectual property
23 Information technology
24 GlaxoSmithKline people
24 Property, plant and equipment

The business and the community
25 Environment, health and safety
26 Global community partnerships
28 Access to medicines

Discussion of the Group's management structures and corporate governance procedures is set out in Corporate governance (pages 29 to 36).

Discussion of the Group's operating and financial performance and financial resources is given in the Operating and financial review and prospects (pages 47 to 68).

---

In this report: 'GlaxoSmithKline' or the 'Group' means GlaxoSmithKline plc and its subsidiary and associated undertakings and the 'company' means GlaxoSmithKline plc; 'GlaxoSmithKline share' means an Ordinary Share of GlaxoSmithKline plc of 25p.

Throughout this report, figures quoted for market size, market share and market growth rates relate to the year ended 30th September 2000 (or later where available). These are GlaxoSmithKline estimates based on the most recent data from independent external sources, valued in sterling at relevant exchange rates. Figures quoted for product market share reflect sales by GlaxoSmithKline and licensees.

Brand names appearing in italics throughout this report are trade marks of GlaxoSmithKline plc, its subsidiaries or associated companies, with the exception of *Nicoderm*, a trade mark of Hoechst Marion Roussel Inc; *Bexxar*, a trade mark of Corixa Corporation, Inc; *Coreg*, a trade mark under licence from Roche Laboratories, Inc; *Factive*, a trade mark of LG Chemical, Ltd; *Navelbine*, a trade mark of Pierre Fabré Médicament and *Panorex*, a trade mark of Centocor, Inc, all of which are used under licence by the Group.

# The business

## History and development of the company

GlaxoSmithKline plc, and its subsidiary and associated undertakings, constitute a major global healthcare group engaged in the creation and discovery, development, manufacture and marketing of pharmaceutical products, vaccines, over-the-counter (OTC) medicines and health-related consumer products.

GlaxoSmithKline has its corporate head office in the London area at:

Glaxo Wellcome House
Berkeley Avenue
Greenford
Middlesex UB6 0NN
England
Tel: 020 8966 8000

GlaxoSmithKline has an operational headquarters in Philadelphia, USA, and operating companies in some 70 countries, with products sold in over 140 countries. The principal research and development (R&D) facilities are in the UK, USA, Japan, Italy and Belgium and products are currently manufactured in some 41 countries.

The major markets for the Group's products are the USA, Japan, the UK, France, Germany and Italy.

GlaxoSmithKline plc is a public limited company incorporated on 6th December 1999 under English law. On 27th December 2000 the company acquired Glaxo Wellcome plc and SmithKline Beecham plc, both English public limited companies, by way of a scheme of arrangement for the merger of the two companies. Both Glaxo Wellcome and SmithKline Beecham were major global healthcare businesses.

### Business segments

GlaxoSmithKline operates principally in two industry segments:

- Pharmaceuticals (prescription pharmaceuticals and vaccines)
- Consumer Healthcare (over-the-counter medicines, oral care and nutritional healthcare).

The businesses in the Healthcare Services segment (primarily Clinical Laboratories and Diversified Pharmaceutical Services) were disposed of in 1999.

**Research and development – Pharmaceuticals**

The global biological and pharmaceutical Research and Development (R&D) function in GlaxoSmithKline is responsible for the generation of information and the acquisition of knowledge required to discover, develop, register, commercialise and effectively market innovative prescription medicines, vaccines and delivery systems for the treatment and prevention of human disease.

Fundamental to this goal is a thorough understanding of the diseases under investigation, increasingly through original work in genetics and predictive medicine research. In addition to the work to create new medicines and vaccines, extensive efforts are made to gain a clear understanding of the unmet needs of patients and healthcare providers as a contribution to the overall direction of R&D.

In 2000 Glaxo Wellcome and SmithKline Beecham together invested over £2.4 billion in pharmaceuticals R&D.

Approximately 16,000 staff are involved in biological and pharmaceutical R&D activities, at more than 20 sites worldwide. These sites include:

- UK: Beckenham, Cambridge, Dartford, Greenford, Harlow, Stevenage, Tonbridge, Ware, Welwyn Garden City
- USA: Research Triangle Park, North Carolina; Philadelphia, Upper Merion and Upper Providence, Pennsylvania; Santa Clara and Palo Alto, California
- Belgium: Rixensart
- Canada: Mississauga
- France: Les Ulis, Rennes
- Italy: Verona, Milan
- Japan: Tsukuba Science City and Takasaki
- Spain: Madrid
- Switzerland: Geneva.

During 2000 a significant amount of work in R&D went into preparing plans and procedures for the optimal integration of key Glaxo Wellcome and SmithKline Beecham R&D processes, so that GlaxoSmithKline would be able to operate effectively and efficiently from day one of the merger. Despite the resources devoted to these activities, several significant new medicines were delivered on schedule to the markets.

### Product approvals and submissions

In 2000 approvals were received for a number of new medicines and vaccines as well as several significant new indications and formulations for existing products, as summarised in the table opposite.

A number of other approvals were also received during 2000. Notable among these were US approvals for *Malarone*, a combination of atovaquone and proguanil to treat and prevent malarial infections and for the paediatric use of *Relenza* to treat influenza. European and US approvals were also received for a 2mg chewable-dispersible tablet formulation of *Lamictal* for the treatment of paediatric epilepsy.

A number of significant regulatory submissions were made during 2000. In the USA these included:

- the first submission for GI198745, a 5-alpha reductase inhibitor for the treatment of benign prostatic hyperplasia, submitted to the FDA in late December 2000
- a submission for a non-CFC metered dose inhaler formulation of *Advair* for asthma
- a submission for the use of *Avandia* in combination with insulin, for the treatment of type 2 diabetes
- a revised submission for an extra strength formulation of the antibiotic *Augmentin* for use in children
- a submission for a sustained release formulation of the antibiotic *Augmentin* for use in adults (both Europe and USA)
- a submission for the adolescent use of intranasal *Imitrex* for the treatment of migraine
- submissions for *Seroxat/Paxil* for the treatment of Generalised Anxiety Disorder and Post-Traumatic Stress Disorder
- submissions for *Infanrix PeNta 5*, a combined diptheria, tetanus, pertussis, polio and hepatitis B paediatric prophylactic vaccine
- a submission for *Twinrix*, a combined hepatitis A and B prophylactic vaccine
- in addition, the BLA for *Bexxar*, a novel treatment for non-Hodgkins lymphoma, was re-submitted to the FDA in September and is now under priority review.

In Europe significant regulatory submissions in 2000 included:

- a once-daily dosing regimen for *Epivir* for HIV infections
- the fluoroquinolone antibiotic *Factive*
- a malaria prophylaxis indication for *Malarone*.

The product development pipeline, set out on pages 16–19, shows considerable breadth and depth.

During 2000 several discovery projects were progressed through non-clinical safety testing and into early (Phase I) clinical development. These are listed in the table opposite.

These compounds are now undergoing rigorous non-clinical, clinical and commercial assessments leading to 'proof of concept' decisions over the next 12–18 months.

In addition to those compounds identified in the table opposite, the following compounds were also in-licensed during 2000:

- GW650250, a mixed monoamine re-uptake inhibitor in Phase II development, in-licensed from NeuroSearch in January 2000
- SB596168, a selective RNA polymerase inhibitor in Phase II development, for the treatment of solid tumours, in-licensed from Taiho in July 2000
- repifermin, keratinocyte growth factor-2 in Phase II development, for wound care, mucositis and the treatment of inflammatory bowel disease, in-licensed from Human Genome Sciences in October 2000
- SB683698, a dual alpha4 integrin antagonist entering Phase II development, for the treatment of a range of inflammatory diseases including asthma, rheumatoid arthritis, inflammatory bowel disease and multiple sclerosis, in-licensed from Tanabe in December 2000.

In February 2001 GlaxoSmithKline completed two further in-licensing agreements. The first was with E Merck for SB 659746, a SSRI + 5HT1a receptor partial agonist in Phase II development for the treatment of depression and other mood disorders. The second was with Sepsicure for GR270773, a phospholipid anti-endotoxin emulsion entering Phase II development for the treatment of sepsis.

## Merger of Glaxo Wellcome and SmithKline Beecham

GlaxoSmithKline plc acquired Glaxo Wellcome plc and SmithKline Beecham plc by way of a scheme of arrangement for the merger of the two companies that became effective on 27th December 2000. Until that date Glaxo Wellcome and SmithKline Beecham operated as separate companies under the management of their respective Boards of Directors.

The Directors of Glaxo Wellcome and SmithKline Beecham during the year 2000 were:

### Glaxo Wellcome plc

Sir Richard Sykes, Chairman
Sir Roger Hurn, Non-Executive Deputy Chairman
Robert Ingram, Chief Executive
Dr Michèle Barzach, Non-Executive
Derek Bonham, Non-Executive
James Cochrane
John Coombe
Peter Job, Non-Executive
Professor Arthur Li, Non-Executive
John McArthur, Non-Executive
Dr James Niedel
Dr Ronaldo Schmitz, Non-Executive
Jeremy Strachan

### SmithKline Beecham plc

Sir Peter Walters, Non-Executive Chairman
Jan Leschly, Chief Executive. Retired 28th April 2000
Jean-Pierre Garnier, Chief Executive from 28th April 2000
Paul Allaire, Non-Executive
Andrew Bonfield
Sir Christopher Hogg, Non-Executive
Baroness Hooper, Non-Executive
Donald McHenry, Non-Executive
Sir Ian Prosser, Non-Executive
Dr Lucy Shapiro, Non-Executive
Dr Tadataka Yamada
John Young, Non-Executive

### Incorporation of GlaxoSmithKline

The company was incorporated as a limited company on 6th December 1999 and subsequently changed its name to GlaxoSmithKline plc. It converted to a public limited company on 22nd May 2000. The company did not itself trade from incorporation until 27th December 2000, when it acquired Glaxo Wellcome and SmithKline Beecham. The first report and financial statements of the company cover the period from incorporation to 31st December 2000, and include the results of the separate Glaxo Wellcome and SmithKline Beecham businesses for the year 2000.

### Directors of GlaxoSmithKline

During the period from incorporation to 23rd May 2000, the following served as directors of the company:

| | |
|---|---|
| Drusilla Rowe | 6th December 1999 to 13th January 2000 |
| Eleanor Zuercher | 6th December 1999 to 13th January 2000 |
| Antonia Rees | 13th January 2000 to 28th January 2000 |
| Hackwood Directors Limited | 28th January 2000 to 15th May 2000 |
| Robert Stern | 13th January 2000 to 15th May 2000 |
| Rupert Bondy | 16th May 2000 to 23rd May 2000 |
| Stephen Cowden | 16th May 2000 to 23rd May 2000 |

The directors listed under 'The Board' (page 30) were appointed on 23rd May 2000 and have served since that date.

## The Board and Executive

### Board

**The Board of GlaxoSmithKline plc** is responsible for the Group's system of corporate governance and is ultimately accountable for the Group's activities, strategy and financial performance. The Board comprises Executive and Non-Executive Directors. The role of Non-Executive Directors is to bring independent judgement to Board deliberations and decisions.

Sir Richard Sykes is Non-Executive Chairman and Dr Jean-Pierre Garnier is Chief Executive.

Sir Roger Hurn and Sir Peter Walters are Non-Executive Deputy Chairmen.

Sir Richard Sykes was employed by Glaxo Wellcome plc as Executive Chairman. All of the other Non-Executive Directors are considered to be independent. Given that two Non-Executive Deputy Chairmen have been appointed, each independent, the company does not consider it necessary to appoint either one as senior independent director.

The Board meets regularly throughout the year. It has a formal schedule of matters reserved to it for decision but otherwise delegates specific responsibilities to Board committees, as described below. The Board works to an agreed agenda in reviewing the key activities of the business, and receives papers and presentations to enable it to do so effectively. Minutes of Board committees, except the Remuneration & Nominations Committee, are placed on the agenda of the Board. The Company Secretary is responsible to the Board, and is available to individual Directors, in respect of Board procedures.

The Company Secretary is Simon Bicknell.

### Board committees

**The Audit Committee** reviews the financial and internal reporting process, the system of internal control and management of risks and the external and internal audit process. The Committee consists entirely of Non-Executive Directors. It meets four times a year with the Chief Executive Officer, the Chief Financial Officer, the heads of internal audit and corporate compliance and the external auditors in attendance.

**The Finance Committee** reviews and approves the major financial and securities transactions of the company, as well as dividends, results announcements and the business of the Annual General Meeting.

**The Remuneration & Nominations Committee** determines the terms of service and remuneration of the Executive Directors and Corporate Officers and considers appointments of Directors and Corporate Officers. The Committee consists entirely of Non-Executive Directors. The Chief Executive Officer attends meetings except when his own remuneration is being considered.

### Corporate Executive Team

The executive management of the Group is the responsibility of the Chief Executive Officer and other senior managers, who form the Corporate Executive Team. The members of the Corporate Executive Team and their responsibilities are listed under 'Corporate Executive Team' (page 31).

### Remuneration of Directors

Information on the remuneration of Directors is given in the Remuneration report.

| | page |
|---|---|
| **O** | |
| Oncology and emesis | 09,52,64 |
| Operating and financial review and prospects | 47–68 |
| Oral care | 09,54,65,150 |
| Other operating income/(expense) | 55,66,89 |
| Outlook | 03,57,58 |
| Over-the-counter (OTC) medicines | 09,54,65,150 |
| **P** | |
| Patents | 22,23 |
| Payment policies | 59 |
| Pension and other post-retirement benefits | 79,116–117,133–135 |
| Pipeline | 16–19 |
| Post balance sheet events | 78 |
| Presentation of financial statements | 78 |
| Price controls | 11 |
| Principal financial statements in US$ | 142–143 |
| Products | |
| approvals and submissions | 14 |
| Consumer Healthcare | 09,10–11,21,23,65 |
| delivered to market | 15 |
| development pipeline | 16–19 |
| discontinuations | 15 |
| liability | 103 |
| new product development | 21 |
| new product supply | 21 |
| Pharmaceuticals | 02,07–09,10–14,22–23, 49–53,62–65,146–150 |
| Profit and loss account | 48,67,72–73,84–85 |
| Property, plant and equipment | 24 |
| Provisions for liabilities and charges | 59,97 |
| **R** | |
| Reconciliation of movements in equity shareholders' funds | 76 |
| Registrar | 157 |
| Regulation | 11 |
| Remuneration & Nominations Committee | 30,32,38 |
| Remuneration report | 37–46 |
| Report of the Directors | 02–68 |
| Research and development | |
| accounting policy | 79 |
| animals and research | 21 |
| Consumer Healthcare | 21 |
| diseases of the developing world | 28 |
| expenditure | 48,54,66 |
| Pharmaceuticals | 14 |
| pipeline | 16–19 |
| Respiratory | 08,10,50,62 |
| Return on capital employed | 151 |
| Revenue – accounting policy | 79 |
| Risk factors | 57,161 |
| Risk Oversight and Compliance Council (ROCC) | 34 |

| | page |
|---|---|
| **S** | |
| Sales | |
| Consumer Healthcare | 09,54,65,150 |
| Pharmaceuticals | 08–09,12,49–53, 62–65,146–149,150 |
| SB Clinical laboratories | 104,105,106 |
| Segment information | 86–88,150 |
| Selected financial data | 67 |
| Senior management – compensation and interests | 46 |
| Share capital | 100,158 |
| Share premium account | 100 |
| Share price | 155,157,158 |
| Share purchases | 61 |
| Share statistics | 151 |
| Shareholder information | 33,157 |
| Shareholder return | 02,154–155 |
| Shareholders' funds | 59 |
| Shareholdings – analysis | 159 |
| Statement of total recognised gains and losses | 72–73,84–85 |
| Strategic Master Plan | 13 |
| **T** | |
| Taxation | 56,66,80,90–91,154 |
| Taxation information for shareholders | 156 |
| Tax rate | 48,91 |
| Trade marks | 05,07,23 |
| Treasury operations | 34,60 |
| Treasury policies | 60 |
| Tuberculosis | 26 |
| **U** | |
| UK segment | 132 |
| US GAAP – reconciliation to US accounting principles | 120–135 |
| consolidated balance sheet | 121 |
| consolidated income statement | 122–123 |
| comprehensive income and changes in shareholders' equity | 122–123 |
| consolidated statement of cash flows | 124,129 |
| earnings per share/ADS | 122–123,130 |
| material differences between UK and US GAAP | 125–129 |
| post-retirement benefits | 133–135 |
| purchase accounting | 120,126–127 |
| results under US accounting principles | 68 |
| segment information | 131–132 |
| selected financial data | 67 |
| taxation | 130 |
| US$ – convenience translation of principal financial statements | 142–143 |
| **V** | |
| Vaccines | 09,10,52,64 |
| **W** | |
| World economy | 49 |
| World market | 49 |